632 F.2d 999
 26 Fair Empl.Prac.Cas. 553,
24 Empl. Prac. Dec. P 31,270
William CAULFIELD et al., Plaintiffs-Appellants,
and
Albert Shanker et al., Intervenors-Plaintiffs-Appellants,
and
Theodore Elsberg et al., Intervenors-Plaintiffs,
v.
BOARD OF EDUCATION OF the CITY OF NEW YORK, Irving Anker,
Defendants-Appellees,
and
Joseph Califano, Jr., et al., Defendants-Appellees,
and
Gordon Ambach, Commissioner of Education, Defendant-Appellee,
and
Coalition of Concerned Black Educators, et al.,
Intervenors-Defendants- Appellees,
and
Ronald Ross, Intervenor-Defendant-Appellee.
 Nos. 733, 734 and 1000, Dockets 79-6191, 79-6193 and 79-6201.
 United States Court of Appeals,
Second Circuit.
 Argued May 21, 1980.
Decided Sept. 22, 1980.
 
 Morris Weissberg, New York City (Harold F. Hay, New York City, on brief), for plaintiffs-appellants.
 James R. Sandner, New York City (Jeffrey S. Karp, Susan Bloom Jones, New York City, on brief), for intervenors-plaintiffs-appellants.
 Allen G. Schwartz, Corp. Counsel, New York City (L. Kevin Sheridan, Deborah G. Rothman, New York City, on brief), for defendants-appellees Board of Ed. of the City of New York, Irving Anker.
 Richard P. Caro, Asst. U.S. Atty., Brooklyn, N. Y. (Edward R. Korman, U.S. Atty. for the Eastern District of New York, Brooklyn, N. Y., Drew S. Days, III, Asst. Atty. Gen., Jessica Dunsay Silver, Mildred M. Matesich, Irving L. Gornstein, Dept. of Justice, Washington, D. C., Albert T. Hamlin, Lois Hochhauser, Dept. of Health, Ed. and Welfare, Washington, D. C., on brief), for defendants-appellees Joseph Califano, Jr., et al.
 James I. Meyerson, N. A. A. C. P., New York City, on brief, for intervenor-defendant-appellee Ronald Ross.
 Arthur N. Eisenberg, New York Civil Liberties Union, New York City (E. Richard Larson, American Civil Liberties Union, Jeanne Silver Frankl, Public Education Association, New York City, on brief), for intervenors-defendants-appellees Coalition of Concerned Black Educators.
 Before LUMBARD, OAKES and MESKILL, Circuit Judges.
 OAKES, Circuit Judge.
 
 
 1
 This appeal, yet another chapter in the litigation concerning hiring, assignment and promotion practices in the New York City school system,[1] is from a final judgment entered on July 17, 1979, in the United States District Court for the Eastern District of New York, Jack B. Weinstein, Judge, dismissing a complaint raising constitutional and statutory objections to a "Memorandum of Understanding" (Memorandum) between the Board of Education of the City of New York (Board) and the Office for Civil Rights (OCR) of the Department of Health, Education and Welfare (HEW). The challenged Memorandum, executed on September 7, 1977, obligated the Board to change its teacher employment and assignment policies in order to remedy the discrimination found by an OCR investigation conducted pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-6, and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1686. Shortly after the Memorandum was signed, plaintiffs-appellants, including a local school board and teachers allegedly affected by the agreement, filed suit against the Board, the State Commissioner of Education, and OCR, seeking declaratory and injunctive relief against certain provisions of the Memorandum as violative of the fifth and fourteenth amendments and Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, 2000e-2. The district court permitted the United Federation of Teachers, the Council of Supervisors and Administrators, and others to intervene as plaintiffs and permitted the Coalition of Concerned Black Educators, and Ronald Ross to intervene as defendants.
 
 
 2
 In a previous chapter in the history of this litigation, this court affirmed a denial of injunctive relief against the enforcement of a provision of the Memorandum requiring the collection of racial and ethnic data by the Board. At the same time this court reversed the district court's order remanding the case to HEW for further proceedings in which plaintiffs-appellants would be permitted to participate. Caulfield v. Board of Education (Caulfield I ), 583 F.2d 605 (2d Cir. 1978). We found in that case that the Memorandum was "voluntary" and that HEW in seeking voluntary compliance with Title VI before resorting to fund termination, was not required to allow the plaintiffs-appellants to participate in formulating the Memorandum. Id. at 612-15; see 42 U.S.C. § 2000d-1. We then remanded for a hearing on the merits of the plaintiffs' constitutional and statutory challenges to the Memorandum. The present appeal is from the district court's dismissal of plaintiffs' complaints and the court's determination that the Memorandum is valid.
 
 FACTS
 
 3
 As a recipient of federal funds, the Board must comply with the nondiscrimination provisions of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d,[2] Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681,[3] and their implementing regulations;[4] it may not discriminate on the basis of race, color, national origin or sex in education programs that receive federal funds. OCR has the responsibility of ensuring compliance through reviews, investigations and complaint resolution. As we recounted in Caulfield I, see 583 F.2d & n.3, the director of OCR advised the Board by letter dated November 9, 1976, that the Board was not in compliance with Title VI, because it had (1) "denied minority teachers full access to employment opportunity" by using racially discriminatory selection and testing procedures and by using racially identifiable employment pools in a way that restricted placement, (2) assigned teachers and principals in a manner that created, confirmed and reinforced racial identifiability of the system's schools, and (3) "assigned teachers with less experience, lower average salaries and fewer advanced degrees to schools with higher percentages of minority students." OCR also found the Board in violation of Title IX because it had denied females equal access to supervisory positions, provided less financial support for female athletic programs, and deprived female teachers of seniority rights and other compensation by failing to eliminate the effects of past discriminatory leave policies.
 
 
 4
 Ten months of negotiation ensued. During this time the Board's Deputy Chancellor Bernard Gifford chaired an internal committee reviewing and evaluating OCR's allegations. What is known as "the Gifford Report" substantiated and confirmed many of OCR's findings, although it denied any discriminatory intent on the part of the Board. See Caulfield I, 583 F.2d at 609 n.5. The Board itself on April 22, 1977, suggested affirmative efforts to equalize employment opportunities. See id. at 608. OCR rejected this proposed compliance plan but further negotiations resulted in the promulgation of the September Memorandum of Understanding challenged in this lawsuit. The Memorandum establishes a three-year plan to comply with Title VI and Title IX through affirmative action. We have set out in the margin key provisions of the agreement as they are reported in Judge Weinstein's memorandum opinion, 486 F.Supp. 862 (D.C.).[5]THE PROCEEDINGS BELOW
 
 
 5
 In appellants' complaint they alleged that HEW lacked Title VI jurisdiction to investigate the Board's employment practices because under 42 U.S.C. § 2000d-3[6] HEW can take such action only with respect to programs in which providing employment is a "primary objective of the Federal financial assistance." They further alleged that the agreement's remedial measures are impermissible absent a formal administrative or judicial finding of intentional discrimination and that the evidence does not support a finding of intentional discrimination. Cf. Lora v. Board of Education, 623 F.2d 248 (2d Cir. 1980) (intentional discrimination required to make out a violation of Title VI). Appellants also contended that the Memorandum, by requiring teacher assignments on the basis of race, established a "quota system" in violation of a number of statutes, including Titles VI and VII of the Civil Rights Act of 1964, and the fifth and fourteenth amendments.
 
 
 6
 The district court held that HEW had jurisdiction to investigate and seek compliance under the authority of 45 C.F.R. § 80.3(c)(3) (1979),[7] a Title VI regulation authorizing oversight of the employment practices of a recipient of federal funds when such practices have a discriminatory impact upon direct beneficiaries of the federal funds, in this case, the students themselves. Here, HEW had alleged that the Board's employment practices have such an effect because discrimination in teacher hiring and assignment has deprived students of equal educational opportunity both by reinforcing the racial identifiability of schools and, in some cases, by resulting in the assignment of less qualified or experienced teachers to predominantly minority schools. The district court found that discrimination by race in the hiring and assignment of teachers or supervisors constitutes discrimination against students. In addition, the court rejected the argument that the Memorandum must be invalidated in the absence of a finding of intentional discrimination. Instead, it upheld the agreement, stating that the issue was really whether the parties entering into a Title VI or Title IX remedial plan had a reasonable belief that the practices at issue might result in liability, whether the remedial measures adopted are reasonable in view of the perceived liability, and whether the measures violate statutory or constitutional rights.
 
 DISCUSSION
 Jurisdiction
 
 7
 We agree with the court below that Title VI enforcement procedures apply to the Board's teacher hiring and assignment practices and that HEW therefore had jurisdiction to investigate and seek compliance. Appellants rely upon section 604 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-3, the section which authorizes administrative action under Title VI with respect to employment practices only when a primary objective of federal funding is to provide employment.[8] Their argument is similar to the one advanced in 1978 by appellants in Caulfield I, 583 F.2d at 610-11. There the argument was made to oppose the collecting of statistics regarding the ethnic and racial composition of the teaching staff. We found, however, that OCR's charging letter to the Board of November 9, 1976, "specifically noted that its concern with discriminatory employment practices was motivated by the unfortunate effect that these practices exercise on minority schoolchildren." Id. at 611. Accordingly, we held that OCR's investigation was within the bounds of 42 U.S.C. § 2000d, which outlaws discrimination in federally funded programs, and not 42 U.S.C. § 2000d-3, because "the objective of OCR's investigation was to alleviate discrimination against minority schoolchildren and not against minority teachers as such." 583 F.2d at 611. We see no reason to depart from our holding in that case. Indeed, we are bound by it, but even if we were not, we would agree with the Fifth Circuit decision in United States v. Jefferson County Board of Education, 372 F.2d 836, 882-86 (5th Cir. 1966) (Wisdom, J.), aff'd en banc, 380 F.2d 385 (5th Cir.) (per curiam), cert. denied, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967), that section 2000d-3 does not bar an action requiring desegregation of school faculty and that faculty integration is essential to student integration. See also Marable v. Alabama Mental Health Board, 297 F.Supp. 291, 297-98 (M.D.Ala.1969) (three-judge court) (Johnson, J.).
 
 
 8
 Appellants also argue that HEW lacked jurisdiction under Title IX to investigate the school system's employment practices. Again, we agree with the lower court that the government could reasonably proceed on the theory that a school system's discrimination against women in access to supervisory positions would have a discriminatory effect on students, the direct beneficiaries of the federal aid. See Islesboro School Committee v. Califano, 593 F.2d 424, 430 (1st Cir. 1979), cert. denied, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 387 (1980).
 
 Teacher Assignment
 
 9
 The author of this opinion would be content to affirm the holding concerning the validity of the Memorandum on the same ground relied on by Judge Weinstein below, viz., that the affirmative remedies required under the Memorandum of understanding were reasonable in light of the parties' reasonable belief that the practices at issue might result in liability under Titles VI and IX and under the Constitution. As early as 1958 a New York state court found that teacher assignment practices were racially discriminatory and that such practices had a discriminatory effect on students. In re Skipwith, 14 Misc.2d 325, 180 N.Y.S.2d 852 (Dom.Rel.Ct.1958). As the district court in the present case noted, since 1951 virtually every commission, agency and consulting firm reviewing the Board of Examiners' system of competitive examinations for teachers has called for its "substantial reform or abolition. ... A chief reason for this criticism has been that the system tended to discourage minority teachers from applying and to screen them out." In Caulfield I we discussed OCR's and the Board's own findings concerning the denial of full access to employment opportunity to minority teachers, the creation and reinforcement of racial identifiability of schools by the placement of teachers, and the assignment of minority teachers with less experience, lower salaries and fewer advanced degrees to predominantly minority schools. See 583 F.2d at 608-09 & nn.3 & 5.
 
 
 10
 In upholding the validity of the Memorandum, the district court compared this voluntary agreement to remedy possible Title VI and Title IX violations to the voluntary agreement to remedy possible Title VII violations upheld in United Steelworkers of America v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). The argument for upholding a voluntary affirmative action plan is even stronger in this case than it was in the Weber case, for here HEW itself initiated the investigation and notified the Board of alleged Title VI and Title IX violations. Cf. Weber, 443 U.S. at 204, 99 S.Ct. at 2728 (Title VII does not prohibit private parties from voluntarily taking steps to comply with Title VII); Regents of the University of California v. Bakke, 438 U.S. 265, 301-02 & n.41, 98 S.Ct. 2733, 2755-56 & n.41, 57 L.Ed.2d 750 (1978) (Powell, J.) (racial preferences may be upheld against constitutional attack when based on findings by administrative body charged with monitoring compliance with antidiscrimination statutes). In fact, both Title VI and Title IX require the government to seek voluntary compliance before terminating funds or taking other steps to enforce compliance. See 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682. Under the circumstances of this case, I agree with the district court that the voluntary agreement between OCR and the Board, though possibly affecting the interests of teachers and others who did not participate in its formulation, is a reasonable and valid effort by the Board to comply with Titles VI and IX.
 
 
 11
 My colleagues, however, rest their decision on a different ground and do not reach the question that the court below and I consider. Their view is that the case in its present posture does not contain an allegation that any individual's "liberty or privacy interests" have been invaded by state action. They recognize that Mr. Justice Powell's determinative opinion in Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), requires that every person has a right to treatment as an individual, free from the adverse consequences of race- or sex-conscious remedies unless there has been a prior administrative, legislative or judicial determination of intentional discrimination against the particular group to be benefitted by the affirmative action plan. Of course, no such finding has been made in the present case.
 
 
 12
 The absence of such a finding, however, does not invalidate the Memorandum. Although teachers do have cognizable interest in avoiding transfer within the system from one school to another, Rodriguez v. Board of Education, 620 F.2d 362 (2d Cir. 1980), the teachers' interest is a limited one. Under Rodriguez, the teachers have an interest, under Title VII, in being free from transfers that "constitute a serious professional setback" and that are made for improper reasons such as sex discrimination. See Id. at 365-66. To be sure, the Rodriguez court identified the right involved as a statutory one, Bakke requires a finding of discrimination before any state action invading a "liberty or privacy interest" of an individual, from whatever source derived.
 
 
 13
 There is no reason to think, my colleagues' position continues, that transfers traceable to the OCR-Board Memorandum of Understanding will in any particular case constitute a "serious professional setback." Until an individual teacher alleges such harm, there is nothing, in their view, to trigger Bakke's requirement of prior findings of discrimination. The simple expectation of being assigned to a particular school within the system is not, then, a right protected under Title VI, Title IX or the Constitution.
 
 Hiring Goals
 
 14
 Appellant Caulfield alone challenges paragraph 6 of the Memorandum. That paragraph has two components, the first requiring the Board to perform "a study of the relevant qualified labor pool by race, ethnicity and sex," and the second requiring the Board, through the adoption and implementation of affirmative action procedures, the support and sponsorship of legislation described in paragraph 4 of the Memorandum and other efforts to achieve levels of minority participation in the teaching and supervisory service "within a range representative of the racial and ethnic composition of the relevant qualified labor pool."
 
 
 15
 We agree with the district court that HEW did have authority to require a census of the labor pool for the same reason, discussed above, that it had authority to investigate and seek compliance. Caulfield argues that paragraph 6 requires the Board to hire on the basis of a racial quota. He contends that this is improper when there has been no finding of an intention to discriminate. However, any claim that the Board will use race as a factor in its hiring decisions is, on this record, purely conjectural and therefore does not amount to a "case or controversy" under article III of the Constitution. No teacher has alleged that the Memorandum has affected the consideration of his job application. Appellant has not demonstrated, as he must, that the threatened injury of which he complains is "real and immediate;" rather, it is "conjectural" and "hypothetical." See O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974); Golden v. Zwickler, 394 U.S. 103, 108-10, 89 S.Ct. 956, 959-60, 22 L.Ed.2d 113 (1969). Indeed until the Board completes a labor pool study that is acceptable to OCR, the extent of the Board's obligations will not begin to be determined. Appellants themselves have argued that the Board's teaching corps is already within a range representative of the qualified labor pool. If this is true, the Board will not be required to take any action under paragraph 6, much less the kind of race-conscious hiring that Caulfield challenges. Because the court may not entertain purely hypothetical cases, Caulfield's challenge must be dismissed.
 
 
 16
 Judgment affirmed.
 
 
 
 [1]
 See Board of Educ. v. Harris, 444 U.S. 130, 100 S.Ct. 363, 62 L.Ed.2d 275 (1979), aff'g 584 F.2d 576 (2d Cir. 1978); Board of Educ. v. Harris, 622 F.2d 599 (2d Cir. 1979), aff'g No. 78 C 2135 (E.D.N.Y.Dec. 22, 1978); Caulfield v. Board of Educ., 583 F.2d 605 (2d Cir. 1978), aff'g in part and rev'g in part 449 F.Supp. 1203 (E.D.N.Y.1978); Board of Educ. v. Harris, 464 F.Supp. 1114, No. 79 C 3233 (E.D.N.Y.Feb. 21, 1980), appeal docketed, No. 80-6050 (2d Cir. Apr. 29, 1980)
 
 
 [2]
 42 U.S.C. § 2000d provides:
 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
 
 
 [3]
 20 U.S.C. § 1681 provides in part:
 (a) No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ...
 
 
 [4]
 The Title VI regulations are in 45 C.F.R. §§ 80.1-.13 (1979); the Title IX regulations are in 45 C.F.R. §§ 86.1-.71 (1979)
 
 
 [5]
 1. Not later than September of 1979, the teacher corps of each District in the system will reflect, within a range of five percent, the racial-ethnic composition of the system's teacher corps as a whole for each educational level and category, subject only to education-based program exceptions
 
 
 [2]
 Not later than September of 1980, each individual school in the system will reflect, within a range of five percent, the racial-ethnic composition of the system's teacher corps as a whole for each educational level and category, subject only to educationally-based program exceptions
 
 
 [3]
 The Board of Education will demonstrate to the Office for Civil Rights, subject to prescribed review, that any failure to meet the commitments set forth in paragraphs one and two hereof results from genuine requirements of a valid educational program. In addition, the Board will demonstrate that it has made and is continuing to make special efforts to overcome the effects of educationally-based program exceptions through effective use of such mechanisms as recertification, recruitment and special assignment of teachers
 
 
 [4]
 The Board ... will adopt and implement the following affirmative action procedures, and will sponsor and actively support state legislation at the next session of the Legislature where necessary to accomplish these ends
 (a) Any test used henceforth to determine whether a person is qualified for a teaching position in the system shall be validated prior to its being administered; except that in cases of demonstrable educational necessity ... a test may be used prior to its validation for temporary assignments, provided that validation shall be accomplished as soon as practicable. ...
 (b) All existing eligibility lists by license shall be combined, and the names of all persons contained thereon shall be merged with the names of any persons who have passed any new tests, without regard to the dates of examinations.
 (c) Rank ordering of persons who have passed examinations for the system shall be abolished.
 (d) In employing and assigning teachers pursuant to these modified standards and procedures, the Board ... will implement affirmative action mechanisms found to be appropriate, such as, for example, giving hiring preferences to all eligible persons with prior experience in the system.
 
 
 [5]
 The Board ... agrees that, in the event that the above-described legislation is not adopted so as to govern employment decisions for the 1978-79 school year, the Board will seek appropriate litigation in support of the agreed objectives
 
 
 [6]
 The Board agrees, as soon as practicable to have performed a study of the relevant qualified labor pool by race, ethnicity and sex by an independent expert acceptable to the parties and pursuant to methodology and standards agreed to by the parties. Through the adoption and implementation of the affirmative action procedures and legislation provided in paragraph 4 ... and other efforts ... the Board commits that by September of 1980, the levels of minority participation in the teaching and supervisory service will be within a range representative of the racial and ethnic composition of the relevant qualified labor pool
 It is understood that this commitment shall not require the Board to lay off any teacher currently employed by the Board or to hire any teacher who has not met appropriate requirements for employment, not inconsistent with this agreement. It is further understood that the commitment made herein does not establish quotas. Failure to meet this commitment shall not be considered a violation of this agreement if the Board demonstrates that it has implemented the provisions of this agreement in a good faith effort to meet the commitment made herein.
 
 
 [6]
 42 U.S.C. § 2000d-3 provides:
 Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.
 
 
 [7]
 45 C.F.R. § 80.3(c) provides in part:
 Employment practices. (1) Where a primary objective of the Federal financial assistance to a program to which this regulation applies is to provide employment, a recipient may not (directly or through contractual or other arangements) subject an individual to discrimation on the ground of race, color, or national origin in its employment practices under such program (including recruitment or recruitment advertising, employment, layoff or termination, upgrading, demotion, or transfer, rates of pay or other forms of compensation, and use of facilities), including programs where a primary objective of the Federal financial assistance is (i) to reduce the employment of such individuals or to help them through employment to meet subsistence needs, (ii) to assist such individuals through employment to meet expenses incident to the commencement or continuation of their education or training, (iii) to provide work experience which contributes to the education or training of such individuals, or (iv) to provide remunerative activity to such individuals who because of handicaps cannot be readily absorbed in the compe(ti)tive labor market....
 (3) Where a primary objective of the Federal financial asssistance is not to provide employment, but discrimination on the ground of race, color, or national origin in the employment practices of the recipient or other persons subject to the regulation tends, on the ground of race, color, or national origin, to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program to which this regulation applies, the foregoing provisions of this paragraph (c) shall apply to the employment practices of the recipient or other persons subject to the regulation, to the extent necessary to assure equality of opportunity to, and nondiscriminatory treatment of, beneficiaries.
 
 
 [8]
 See note 6 supra