Lorraine KROMNICK, Lorraine Branca-
to, Gladys Hirsh, and Regina Katz

v.

SCHOOL DISTRICT OF PHILADELPHIA
and Board of Education of the School
District of Philadelphia.

Civ. A. No. 81–5013.

United States District Court,
E.D. Pennsylvania.

Jan. 17, 1983.

Robert M. Goldich, Philadelphia, Pa., for plaintiffs.

Martin Horowitz, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

This employment discrimination class action brought by four white elementary school teachers challenges the validity of a 75%/125% quota system used by defendant

School District of Philadelphia ("District") to maintain racial balance in the faculties of all of the schools (elementary, middle or junior high school, and high school) of the District.[1] Under the quota system, each school is required to employ between 75% and 125% of the existing proportion of black teachers employed city-wide at that school's respective level (elementary, middle or junior high school, and high school) in the school system. The quota system was first imposed by the District in June, 1978 at the insistence of the Office of Civil Rights of the then existing United States Department of Health, Education and Welfare ("OCR") as a remedial device to desegregate school faculties and in order to maintain eligibility for federal school funding. On June 23, 1982, OCR informed the District that, as Philadelphia's school faculties were now successfully integrated, the District need not continue its 75%/125% quota system. Nonetheless, on August 2, 1982, the School Board of Philadelphia decided to retain the 75%/125% quota in order to maintain faculty integration.

Plaintiffs contend that use of a quota system for the sole purpose of maintaining faculty racial balance violates the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs also contend that the quota system violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Pursuant to plaintiffs' demand for injunctive and declaratory relief, a final injunction hearing was held on September 1 and 2, 1982, and on December 3, 1982, the Court heard oral argument. The Court's findings of fact and conclusions of law are set forth below.

## I. Findings of Fact

The District currently employs over 12,000 teachers in the approximately 285 public schools in the City of Philadelphia. Prior to 1969, the distribution of black and white teachers at each level (elementary, middle or junior high school, and high school) of the school system reflected a racial imbalance. Many schools had a disproportionate number of either white or black teachers in comparison to the district-wide employment of white and black teachers. For this reason, many school faculties were "racially identifiable" as either white schools or black schools.

In 1969, the District, under a Consent Order which the District voluntarily entered into with the Pennsylvania Human Relations Commission ("PHRC"), set the following integration goals: that no elementary school would have fewer than 20% of either black or white teachers, and that no secondary school would have fewer than 10% of either race as teachers. In order to achieve its integration goals the District made certain changes in its teacher placement policy. Between 1969 and 1978, newly hired teachers were assigned to particular schools on the basis of their race and the District's needs in light of its quota. Transfers of existing teachers were similarly affected. Voluntary transfers were restricted where a transfer would create or aggravate a racial imbalance in either the transferor or transferee school. No restrictions were placed on involuntary transfers. Between 1969 and 1978, as a result of these policy changes, the District made substantial progress toward the integration goals established by the Consent Order.

In 1978, the District applied for federal aid under the Emergency School Aid Act, Pub.L. 89–10, Title VI, § 601, as added Pub.L. 95–561, Title VI, § 601(a), 92 Stat. 2252 (codified at 20 U.S.C. §§ 3191–3207) (repeal effective Oct. 1, 1982) ("ESAA").

---

1. On March 23, 1982, the Court certified plaintiffs' claim as a class action under Fed.R.Civ.P. 23(b)(2) for injunctive and declaratory relief. The class included:

   All teachers employed by the defendants who have since August 1, 1978 been involuntarily transferred because of their race due to defendants maintenance of a racial quota system; all teachers employed by the defend-

   ants who, upon being involuntarily transferred since August 1, 1978 have been prevented from exercising seniority rights in selecting new schools because of the quota system; and all teachers who will in the future be involuntarily transferred or who will be prevented from exercising seniority rights in selecting new schools because of the quota system.

In response to this application, OCR undertook a study of the District teacher assignments and the resulting percentages of black and white teachers at the various schools in the District. On the basis of this investigation and statistics submitted by the District, the OCR determined that despite the District's efforts pursuant to the 1969 Consent Order, a number of the Philadelphia school faculties were still racially identifiable and thus, that a racial imbalance existed. The OCR concluded that the District would not be eligible for ESAA funds unless it agreed to implement the 75%/125% remedial quota set forth in the ESAA regulations promulgated pursuant to the Act. Letter from OCR to Superintendent of School District of Philadelphia (June 22, 1978) and Letter from OCR to Superintendent of School District of Philadelphia (August 8, 1978).

In order to maintain eligibility for the ESAA funds, the District agreed to adopt the 75%/125% OCR policy. Under the policy, each individual school in the District would be required to employ between 75% and 125% of the existing proportion of black teachers employed city-wide at that school's respective level (elementary school, middle or junior high school, and high school) in the school system. Resolution of Board of Education of School District of Philadelphia (August 21, 1978); *see* Letter from Legal Counsel for School District of Philadelphia to OCR (August 22, 1978). According to the OCR, adherence to these federal guidelines would result in complete faculty racial integration in all of the schools of the District.

As a result of the quota system, minimum and maximum limits were placed upon the number of black and white teachers who could be assigned to each school within the system. For example, if 40% of the District's elementary school teachers were black, each elementary school would be required to employ between 30% to 50% black teachers, i.e., 75% to 125% of 40%. In an elementary school with 10 teachers, 3 to 5 would have to be black under the OCR 75%/125% quota. In another example, if 50% of the District's high school teachers were black, each high school would be required to employ between 37.5% to 62.5% black teachers, i.e., 75% to 125% of 50%. Thus, in a high school with 10 teachers, 4 to 6 would have to be black under the OCR 75%/125% quota.

In September, 1978, September, 1979, September, 1980, and December, 1981, the District required a number of teachers to be involuntarily transferred because of decreases in student enrollment. In order to meet the needs of reassigning teachers according to the decline in the number of students, keeping in mind the restrictions imposed by the 75%/125% quota, the following formula was used to implement the involuntary transfers: When a transfer was needed from a particular school, the least senior teacher of the race of which the school was racially identifiable would be the one who would be transferred. For example, if a school was racially identifiable as white under the 75%/125% quota, the least senior white teacher would be transferred, even though that white teacher had more school seniority than a similarly situated black teacher. Moreover, after a teacher's transfer out of a particular school, his or her placement in a new school was controlled by his or her race because of the need to maintain the faculty integration levels at all schools within the 75%/125% standard. Thus, a teacher was subject to being involuntarily transferred out of a particular school solely on the basis of race, and then was subject to a restriction in the choice of schools to which he or she could be reassigned solely on the basis of race. On a few occasions, teachers were involuntarily transferred out of a school solely on the basis of race without a specific numerically related need for the reassignment of that teacher, because of the District's singular desire in these cases to meet the 75%/125% standard.

On December 8, 1981, four white kindergarten and elementary school teachers, Lorraine Kromnick, Lorraine Brancato, Gladys Hirsh, and Regina Katz, brought this suit seeking declaratory and injunctive relief because they were potentially subject to invol-

untary transfers on the basis of their race under the 75%/125% racial quota. On December 29, 1981, the Court denied plaintiffs' motion for a preliminary injunction because it found that the imposition of the 75%/125% quota was justified in view of the OCR's administrative finding of an existing racial imbalance. N.T. 1–7 to 1–10. At a subsequent hearing, the Court directed the District to contact OCR with respect to any further need to continue the 75%/125% quota. The District requested OCR to undertake a review of the racial balance of the school faculties.

On June 23, 1982, OCR informed the District that, based on a review of the District's assignment of its teachers under the ESAA 75%/125% quota, the District was determined to be "substantially in compliance with the agreement" and that the "district is under no further obligation to continue to meet the 75%/125% standard." Letter from OCR to Superintendent of School District of Philadelphia (June 23, 1982). OCR noted, however, that the "district is free to continue to maintain this standard [75%/125%] if it so chooses." *Id.* OCR emphasized that "while the district is not required to meet strict racial ratios, the district must continue to use nondiscriminatory policies in the hiring, firing and assignment of teachers." *Id.*

On August 2, 1982, the School Board of Philadelphia decided to continue the 75%/125% quota system in order to maintain faculty integration. The purpose of the quota as presently applied under the School Board's decision is not to remedy past discrimination in teacher assignments, but to guard against the possibility that the system will revert to its pre-1978 level of racial imbalance in faculty assignments. Thus, the basic character of the 75%/125% standard as now voluntarily applied by the District at its own discretion is that of an elective racial quota.

II. *Discussion*

The question presented is whether the District's retention of the 75%/125% quota to maintain faculty racial balance violates the Equal Protection Clause of the Fourteenth Amendment and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* This issue is one of first impression as past cases have only addressed the question of whether such a quota system can be used as a remedial device and have never faced the question of whether a quota can be used to maintain the status quo once the past discrimination has been remedied.

The starting point for any discussion of the quota issue is the United States Supreme Court's landmark decision in *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). In *Bakke,* a white student challenged the validity of a racial quota used by the Medical School of the University of California at Davis to assure the admission of at least sixteen minority students to the medical school. Allan Bakke contended that the quota system violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.,* and the Equal Protection Clause to the Fourteenth Amendment. The Court in a 5–4 decision struck down the school's quota system. Unfortunately, the Court was divided in its reasoning and a majority opinion was not issued.

Justice Powell, in announcing the judgment of the Court, held that the racial quota was unconstitutional because it failed to pass muster under the strict scrutiny test. Justice Powell stated:

> We have held that in "order to justify the use of a suspect classification, a State must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is 'necessary ... to the accomplishment' of its purpose or the safeguarding of its interest."

.    .    .    .    .

> We have never approved a classification that aids persons perceived as members of relatively victimized groups at the expense of other innocent individuals in the absence of judicial, legislative, or administrative findings of constitutional or statutory violations.... After such findings have been made, the governmen-

tal interest in preferring members of the injured groups at the expense of others is substantial, since the legal rights of the victims must be vindicated.

438 U.S. at 305, 307, 98 S.Ct. at 2757 (Powell, J.) (citations omitted). Applying this test to the facts of the case, Justice Powell concluded that the medical school had failed to show that the challenged classification was necessary to promote a substantial state interest. *Id.* at 319–320, 98 S.Ct. at 2763. Justice Powell emphasized that race could be considered as a "factor" but that it could not be used in the sense of a strict quota. *Id.* at 317–318, 98 S.Ct. at 2762–63. Chief Justice Burger and Justices Stewart, Rehnquist and Stevens concurred in part and dissented in part. They agreed that the quota was invalid, however, they held that because it was prohibited by Title VI, the constitutional question need not be addressed. 438 U.S. at 418–421, 98 S.Ct. at 2813–15 (Burger, C.J., Stewart, Rehnquist, Stevens, JJ. concurring in part and dissenting in part). They determined that the issue of whether race could be considered as a factor was not an issue in the case. *Id.* at 411, 98 S.Ct. at 2809. Justices Brennan, White, Marshall and Blackmun also concurred in part and dissented in part. They decided that the quota system was not unconstitutional because it furthered a substantial state interest. 438 U.S. at 378–379, 98 S.Ct. at 2793–94 (Brennan, White, Marshall, Blackmun, JJ., concurring in part and dissenting in part). In achieving this result, they employed the following standard for examining racial classifications with a remedial purpose: "racial classifications designed to further remedial purposes 'must serve important governmental objectives and must be substantially related to achievement of those objectives.'" *Id.* at 359, 98 S.Ct. at 2783 (citations omitted).

A second landmark decision necessary to any discussion of this issue is the Supreme Court's pronouncement in *United Steel Workers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). In *Weber,* white workers brought a challenge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* against a voluntary affirmative action plan which had been agreed to by the Kaiser Aluminum Company and the United States Steelworkers. Under the plan, black workers were reserved 50% of the openings in an in-plant craft-training program until such time as the percentage of black craft-workers in the plant equaled the percentage of blacks in the local labor force. The Kaiser-USWA plan did not involve state action and thus did not present an equal protection issue. The Court, refusing to strike down the questioned plan, held that Title VII, in prohibiting racial discrimination in employment programs, does not prohibit all private, voluntary, race-conscious affirmative action plans. *Id.* at 207–208, 99 S.Ct. at 2729–30. The Court stated:

> We need not today define in detail the line of demarcation between permissible and impermissible affirmative action plans. It suffices to hold that the challenged Kaiser-USWA affirmative action plan falls on the permissible side of the line.... The plan does not require the discharge of white workers and their replacement with new black hirees.... Nor does the plan create an absolute bar to the advancement of white employees; half of those trained in the program will be white. Moreover, *the plan is a temporary measure; it is not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance. Preferential selection of craft trainees at the Gramercy plant will end as soon as the percentage of black skilled craftworkers in the Gramercy plant approximates the percentage of blacks in the local labor force.*

*Id.* at 208–209, 99 S.Ct. at 2729–30 (emphasis added) (citations omitted).

In the present case, the District has continued the use of a 75%/125% racial quota in order to maintain racial balance. Although *Bakke* and *Weber* are not precisely on point, they provide useful guidance for assessing when and for what purposes racial quotas can be used.

## A. Equal Protection

■ The Equal Protection Clause to the Fourteenth Amendment provides: "[N]or shall any State ... deny to any person within its jurisdiction the equal protection of the laws." Plaintiffs do not dispute that the District's use of the 75%/125% quota to remedy past discrimination in the form of a faculty racial imbalance was lawful and proper under the standards imposed by the Equal Protection Clause, because of the OCR's administrative finding of racial imbalance. *See Regents of University of California v. Bakke, supra,* 438 U.S. at 307–308, 98 S.Ct. at 2757 (once judicial, legislative or administrative findings of constitutional or statutory violations have been made, governmental interest in preferring members of injured groups at the expense of others is substantial). Plaintiffs contend, however, that the continuance of the 75%/125% quota system is unconstitutional because it is *permanent* rather than *temporary* and because it serves to *maintain racial balance* rather than to *remedy past discrimination.*

Since the quota system classifies on the basis of race, the District has the burden of showing that the quota system passes muster under the Fourteenth Amendment. *Regents of University of California v. Bakke, supra.* Unfortunately, the *Bakke* Court did not make clear whether the appropriate standard of review for an affirmative action racial quota is a strict scrutiny or a "middle tier" analysis. Nonetheless, the Court finds that the District's race conscious quota fails to pass muster under either test.

In the present case, the District argues that continued use of the 75%/125% standard shelters the important governmental objective of maintaining racially balanced faculties and schools, thus enhancing the educational environment of the students. Then, relying on its own conclusion that absent the quota system the racial composition of its faculties would revert to prior levels of segregation, the District argues that it has met its burden of showing that continuance of the quota system is substantially related to achievement of that objec-

tive. The Court cannot agree. Although the governmental objective of maintaining desegregated school faculties in order to enhance the educational opportunities of the school children is indeed a legitimate and important objective, the District has failed to show that the quota is substantially related to the achievement of that objective.

First, the District has failed to show through empirical evidence that the system will revert back to prior levels of segregation if the quota system is not maintained. Sheer speculation as to what will happen if the quota system is lifted and nondiscriminatory policies in the hiring, firing and assignment of teachers are used, will not support the continuance of the racial quota. Second, the District has failed to show that other nondiscriminatory alternatives for maintaining faculty integration cannot be applied.

■ Generally, a racial quota is a temporary measure constructed both to remedy past discrimination and to achieve the desired result of either equality or desegregation. *See, e.g., United Steel Workers of America v. Weber, supra; Swann v. Charlotte-Mechlenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). All of the cases cited by the District in support of the racial quota are distinguishable from the present facts. In each of those cases, the quota system was used to remedy past discrimination and not to maintain racial balance. *See, e.g., Swann v. Charlotte-Mechlenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Caulfield v. Board of Education of City of New York,* 632 F.2d 999 (2d Cir.1980); *Zaslawsky v. Board of Education of Los Angeles City Unified School District,* 610 F.2d 661 (9th Cir.1979). *See also Regents of University of California v. Bakke, supra,* 438 U.S. at 300 n. 39, 98 S.Ct. at 2753 n. 39 (dictum). It is of no moment that the simple expectation of being assigned to a particular school within the school system is not a property interest protected under the Constitution. *See Caulfield v. Board of Education of City of New York, supra,* 632

F.2d at 1006–1007. ("The simple expectation of being assigned to a particular school within the system is not, then, a right protected under Title VI, Title IX or the Constitution.") Even assuming that this be true, each individual still has the constitutional right under the equal protection guarantee to be protected from distinctions based solely on race in the absence of a substantial state interest in support of the racial classification. *Regents of University of California v. Bakke, supra,* 438 U.S. at 289–291, 98 S.Ct. at 2747–49. This right constitutes a liberty interest under the Equal Protection Clause of the Fourteenth Amendment based on the right to racial equality. *See Regents of University of California v. Bakke, supra,* 438 U.S. at 294, 98 S.Ct. at 2750.

### B. Title VII

■ Section 703(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) provides:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise *to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,* because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

(Emphasis added). Title VII prohibits racial discrimination against whites on the same basis and under the same standards as it prohibits racial discrimination against blacks. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 278–280, 96 S.Ct. 2574, 2577–79, 49 L.Ed.2d 493 (1976). As stated earlier, the Supreme Court has held that not all voluntarily enacted programs which take race into consideration are prohibited under Title VII. *United Steel Workers of America v. Weber, supra.* However, after reviewing the present quota system as currently applied by the District, the Court holds that the 75%/125% quota falls on the impermissible side of the demarcation between permissible and impermissible racially cognizant classifications. The salient and ultimately fatal characteristic of the District's quota system is that its only function is to preserve the existing racial percentages. This contrasts sharply with the remedial nature of the affirmative action plan approved by the Supreme Court in *Weber.* In view of *Weber* and after careful consideration of the purposes of Title VII, this Court concludes that while such a system may have been a permissible means of attaining a given racial balance, that system ventures into the impermissible range if it continues to allow race to be the sole criterion affecting employment once the desired end is actually met. To decide otherwise would be to sanction the persistent consideration of a particular human characteristic, race, that the law has declared shall not be an allowable basis for a distinction. Those decisions which have allowed race to be weighed under certain remedial affirmative action plans, did so in order to correct past vestiges of discrimination. The reasons supporting those decisions cannot be used to justify continued consciousness of race where, as here, the desired elimination of a particular discriminatory practice has been achieved.

Defendant points out that the 75%/125% quota does not require the discharge of white teachers and their replacement with black hirees, nor does it create an absolute bar to the advancement of white teachers since white teachers will still be able to teach although only in certain designated schools. Defendant also points out, and the Court agrees, that the quota's only effect is to impinge on an individual teacher's selection of certain schools within which he or she may teach. Defendant cites *Caulfield v. Board of Education of the City of New York,* 632 F.2d 999 (2d Cir.1980), in support of the proposition that the mere expectation of being assigned to a particular school

within the district on the basis of seniority is not a right protected under Title VII. *Caulfield,* however, is not on point. In *Caulfield,* the court stated:

> Although teachers do have cognizable interest in avoiding transfer within the system from one school to another, *Rodriguez v. Board of Education,* 620 F.2d 362 (2d Cir.1980), the teachers' interest is a limited one. Under *Rodriguez,* the teachers have an interest, under Title VII, in being free from transfers that "constitute a serious professional setback" and *that are made for improper reasons* such as sex discrimination. *See Id.* at 365–66.

632 F.2d at 1006 (emphasis added). *Caulfield,* however, was decided on the basis that the quota system was needed to remedy possible Title VI and Title IX violations. *Id.* The court considered this remedial purpose in assessing the interests of the faculty and whether or not the transfers were made "for improper reasons." The present case is clearly distinguishable from the facts of *Caulfield.* Clearly, the expectation of being assigned to a particular school within the District on the basis of seniority constitutes a term, condition, or privilege of employment. Thus, the involuntary transfer of a teacher from a particular school solely on the basis of race and the imposed restriction on the selection of a new school solely on the basis of race constitutes racial discrimination with respect to the "terms, conditions or privileges of employment." Such discrimination is prohibited by Title VII under all the circumstances and this Court cannot allow it to stand. The quota is permanent and not temporary. Its purpose is to preserve the status quo and not to remedy past discrimination. However desirable it is to maintain racial balance, school teachers cannot be deprived of their rights under Title VII. The District must explore other nondiscriminatory alternatives, apart from a strict racial quota system, in its effort to maintain the existing levels of racial integration among the faculty.

### C. Relief

The District will be enjoined from using the 75%/125% quota system as applied to involuntary transfers in selecting teachers to be involuntarily transferred and in restricting the selection rights of teachers required to be involuntarily transferred. The relief granted will be prospective from the date of this decision, and will not revert back to September, 1982, because of the District's good faith reliance upon the OCR determination of June 23, 1982, that the District could continue its use of the 75%/125% standard. Letter from OCR to Superintendent of the School District of Philadelphia (June 23, 1982) ("Of course, your district is free to continue to maintain this standard [75%/125%] if it so chooses."). Other alternatives must now be explored by the District apart from a strict racial quota in order to maintain racial balance in school faculties across the District.

### III. *Conclusions of Law*

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 2000e–5.

2. The District's use of the 75%/125% quota as applied to involuntary transfers of school teachers from August, 1978 to June, 1982 to remedy racial imbalance in District school faculties did not violate the Equal Protection Clause to the Fourteenth Amendment or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

3. The District's use of the 75%/125% quota as applied to involuntary transfers of school teachers from August, 1982 to the present day to maintain racial balance in District school faculties without resort to nondiscriminatory alternatives violates the plaintiffs' rights under the Equal Protection Clause to the Fourteenth Amendment and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

4. Plaintiffs are entitled to an injunction restraining the District from further use of the 75%/125% quota system as applied to involuntary transfers in selecting teachers to be involuntarily transferred and in restricting the selection rights of teachers required to be involuntarily transferred.

An appropriate Order will be entered.

## ORDER

AND NOW, TO WIT, this 17th day of January, 1983, for the reasons stated in the foregoing Memorandum, IT IS ORDERED that the School District of Philadelphia and the Board of Education of the School District of Philadelphia is hereby *enjoined* from using the 75%/125% quota system as applied to involuntary transfers in selecting teachers to be involuntarily transferred and in restricting the selection rights of teachers required to be involuntarily transferred.