[Civ. No. 29792. Fourth Dist., Div. Two. May 11, 1984.]

DONNA M. BOLIN, Plaintiff and Appellant, v.
SAN BERNARDINO CITY UNIFIED SCHOOL DISTRICT et al.,
Defendants and Respondents.

**COUNSEL**

Albert H. Maldonado for Plaintiff and Appellant.

Ronald C. Ruud and Atkinson, Andelson, Loya, Ruud & Romo for Defendants and Respondents.

OPINION

**MORRIS, P. J.**—Plaintiff brought an action under 42 United States Code sections 1981 and 1983. Her complaint alleged that defendant discriminated against plaintiff because of her race and that defendant denied plaintiff her rights of free speech and association under the First Amendment. After three days of a jury trial, the court granted defendant's motion for a nonsuit. Plaintiff has appealed.

FACTS

Plaintiff, a white female, has been employed as a teacher by the San Bernardino City Unified School District for approximately 20 years. During that period, she has been assigned to seven different schools. For the school year 1979-1980, plaintiff was initially assigned to Marshall Elementary School. At the beginning of the year, plaintiff was transferred to Monterey School. She filed a grievance stating the reason for her transfer, faculty integration, was discriminatory. She claimed she was transferred solely because of her white race. Plaintiff was returned to Marshall when a vacancy occurred at that school, and the grievance was settled.

Prior to the 1980-1981 school year, the personnel director informed her she would again be transferred from Marshall, this time to Roosevelt Elementary School.

At the time of the transfer, the districtwide ratio of minority elementary teachers was 29 percent and the district had adopted guidelines providing for 20 to 45 percent minority faculty at each school in order to balance racial composition. The guidelines were developed in response to directives from the Office of Civil Rights (OCR). In the mid-1970's, the OCR directed the district to racially balance its faculty as required by the Emergency School Aid Act (20 U.S.C. § 1605(d)(1)(B) repealed Nov. 1, 1978, Pub.L. No. 95-561, 92 Stat. 2268). To comply with the requirements each school would have to maintain a minority faculty composition of not less than half or more than twice the districtwide ratio.

The range varied from year to year, depending on the percentage of minority faculty in the district. For example, in a previous year when minorities made up 16 percent of the overall elementary faculty, the guidelines were established at 8 percent and 32 percent. For the 1980-1981 school year when 29 percent of the elementary teachers were minorities, the 20 to 45 percent range was deemed appropriate. At the beginning of the 1980-1981

school year, Marshall school had a minority staff of 36 percent, Roosevelt had one of 55 percent.

Plaintiff's involuntary transfer was triggered by overstaffing at Marshall. Marshall was the magnet school for a special bilingual program in the district. A teacher with bilingual credentials was hired to meet the program's needs. This, along with a drop in enrollment, made it necessary to reduce the faculty by one.

Transfers and reassignments are controlled by the collective bargaining agreement between the district and the San Bernardino Teacher's Association. The associate superintendent testified that under the contract, the district must first determine that a valid reason for transfer exists, in this case, the expansion of the bilingual program. The district then determines where teachers with special credentials are needed. Then, keeping in mind vacancies within the whole district, they look for the least senior person who can be transferred according to district needs.

The director of personnel for the district testified that in transferring plaintiff, the district, according to contract, first asked for volunteers. Secondly, credentials were reviewed and plaintiff did not possess the necessary bilingual credential. Next, the ethnicity of the staff was reviewed with the aim of maintaining the 20 to 45 percent OCR guidelines. Roosevelt was at 55 percent minority. Plaintiff's transfer would bring it closer to the 45 percent guidelines. Lastly seniority was considered, so that plaintiff, the least senior white teacher at Marshall school without a bilingual credential, was selected for transfer.

When the personnel director informed plaintiff she had been selected for transfer, she became very upset, and began to tremble and cry. Because of her adverse reaction, the director presented plaintiff with a list of open positions throughout the district. The contract provides that when a teacher is involuntarily transferred, such a list will be made available and the teacher may request the position he or she desires. Plaintiff selected Belvedere Elementary School, to which she was ultimately transferred. To maintain the integrity of its procedures and to be fair to all teachers, district policy prohibited plaintiff's return to Marshall unless a vacancy occurred.

Plaintiff's transfer from Marshall brought that school's minority faculty from 36 percent to 38 percent. Her transfer to Belvedere brought the minority percentage from 29 percent to slightly less than 29 percent. Her transfer to Roosevelt would have brought the school closer to the 45 percent

mark. Ultimately, Roosevelt was brought within the 20 to 45 percent range when two white teachers hired by the district were assigned there.

Plaintiff informed school officials that she believed her transfer constituted reverse discrimination. Plaintiff's request to meet with the school board was denied, but plaintiff was informed she could file a complaint under the affirmative action policy. Plaintiff did not file a grievance under the contract as she had in 1979, neither did she apply for a voluntary transfer back to Marshall.

Although plaintiff suffered no loss of earnings or change in the terms and conditions of her employment, and even told the Belvedere principal she was happy with the school, plaintiff claims to have suffered severe physical pain and mental anguish as a result of her transfer. Plaintiff began visiting a clinical psychologist for psychotherapy in February 1982, nearly 18 months after her transfer.

### DISCUSSION

■ Plaintiff contends that use of the 20 to 45 percent guidelines imposes an impermissible racial quota which constitutes racial discrimination and violates her civil rights under title 42 United States Code section 1981 and the equal protection clause of the Fourteenth Amendment.

■ It is true that 42 United States Code section 1981 applies to white as well as black citizens, but it must be shown that one race is being given preferential treatment over another. (See *McDonald* v. *Santa Fe Trail Transp. Co.* (1976) 427 U.S. 273 [49 L.Ed.2d 493, 96 S.Ct. 2574].) ■ Plaintiff contends that minority teachers were given preferential treatment by not being involuntarily transferred. However, school officials testified that had a predominantly white school been furthest from compliance with the guidelines, the least senior black teacher would have been transferred, and, in fact, a black teacher was transferred from Marshall on the same basis the following school year.

Plaintiff does not dispute that the use of racial quotas is valid to remedy past discrimination, but argues that such quotas must be temporary measures and designed to achieve equality, not to maintain a strict racial ratio. Citing *Associated Gen., etc.* v. *San Francisco Unified Sch.* (9th Cir. 1980) 616 F.2d 1381 and *Anderson* v. *San Francisco Unified School District* (N.D.Cal. 1972) 357 F.Supp. 248, plaintiff contends that racial quotas may be used *only* to remedy past discrimination. Plaintiff contends that she has been a victim of a "stacked deck" program where the state favors members of

minorities in the competition for benefits that the state can give to some, but not all, of its citizens.

Plaintiff's reliance on *Anderson* and *Associated* is misplaced. In *Anderson,* the school district implemented an affirmative action plan which virtually guaranteed all administrative assignments and promotions to minority personnel. In *Associated,* the court struck down an affirmative action plan requiring that construction contracts go to minority contractors or contractors that utilized minority subcontractors for 25 percent of the work. The court distinguished "stacked deck" programs from "reshuffle programs" saying: "In a 'stacked deck' operation, a scarce benefit goes to one individual, while another individual is totally deprived of it. 'Reshuffle' programs not only provide something to everyone, they provide the same thing (e.g., education in an integrated school) to everyone.

"In the short run, a 'stacked deck' program works wholly to the benefit of certain members of one group, and correspondingly to the harm of certain members of another group. 'Reshuffle' programs theoretically provide some benefits also to the whites, for their exposure to the minorities is expected to bring understanding and wisdom." (616 F.2d at p. 1387.)

Plaintiff also relies on *Steelworkers* v. *Weber* (1979) 443 U.S. 193 [61 L.Ed.2d 480, 99 S.Ct. 2721] and *University of California Regents* v. *Bakke* (1978) 438 U.S. 265 [57 L.Ed.2d 750, 98 S.Ct. 2733]. However, both of these cases related to "stacked deck" type remedial programs in which racial quotas were established in connection with important substantive rights such as school admission and employment. In contrast, the issue here hinges on the legality of a reshuffle program where no economic interest is at stake. The faculty integration plan in San Bernardino does not discriminate on the basis of race. It merely requires that, whatever the overall racial composition of the faculty is, the assignment of teachers be reasonably balanced among all the elementary schools throughout the school district.

Plaintiff cites *Kromnick* v. *School Dist. of Philadelphia* (E.D.Pa. 1983) 555 F.Supp. 249 as her primary authority. In *Kromnick* the school district required that each school employ between 75 percent and 125 percent of the existing proportion of black teachers employed districtwide. The quota system was first imposed for the purpose of desegregation at the insistence of the OCR, in order to maintain eligibility for school funding. Four years later the OCR informed the district that it was successfully integrated and that it no longer need continue its quota system. The district voted to continue to use the 75 percent to 125 percent quota to maintain integration. On

some occasions, teachers were involuntarily transferred solely to maintain the quota, and without a related need for the reassignment of that teacher.

In holding that the quota violated the Fourteenth Amendment, the court found that although the governmental objective of maintaining desegregated school facilities in order to enhance the educational opportunities of the pupils was a legitimate objective, the district had failed to show that the strict quota is substantially related to the achievement of that objective. (*Id.*, at p. 254.) The court further found that the "involuntary transfer of a teacher from a particular school *solely on the basis of race* and the imposed restriction on the selection of a new school *solely on the basis of race* constitutes racial discrimination with respect to the 'terms, conditions or privileges of employment'" (*id.*, at p. 256, italics added) and thus violated title VII. However, the court upheld the use of the 75 percent to 125 percent quota as applied to involuntary transfers prior to the time OCR lifted its requirement.

In this case, unlike *Kromnick*, the OCR has never made a finding that the district has successfully integrated its staff. The district's guidelines and transfer policy were formulated in response to the OCR directives which were never rescinded. Further, the *Kromnick* court found a transfer solely on the basis of race to be unacceptable. The Supreme Court has expressly stated that race may be used as a factor but it cannot be used in the sense of a strict quota. (*University of California Regents* v. *Bakke, supra,* 438 U.S. at pp. 317-318 [57 L.Ed.2d at pp. 788-789].) In the case before us, the district used ethnicity as one factor, along with credentials, the needs of the students, and seniority, in deciding which teacher to transfer.

The Supreme Court has stated that an integration plan involving prescribed ratios can be voluntarily adopted by a school board: "School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities; . . ." (*Swann* v. *Board of Education* (1971) 402 U.S. 1, 16 [28 L.Ed.2d 554, 566-567, 91 S.Ct. 1267].) Ethnicity may also be taken into account in the assignment of teachers. Faculty assignment has been found to play a strong role in school integration. (*Id.*, at pp. 18-19 [28 L.Ed.2d at pp. 567-568].)

In *Zaslawsky* v. *Board of Ed. of Los Angeles City, etc.* (9th Cir. 1979) 610 F.2d 661, teachers argued that the faculty integration plan violated the

Fourteenth Amendment and 42 United States Code section 1981 because it took race into account in the mandatory reassignment of teachers. The integration plan was to have each school's faculty reflect, within a range of plus or minus 10 percent, the districtwide racial composition of the faculty. As in the case before us, the plan was adopted at the insistence of OCR, and absent judicial finding of dejure segregation. The court found that the action of the school board was not directed towards employment opportunities or the elimination of past discrimination in employment, but at enhancing the educational opportunities available to students. As the Ninth Circuit noted, this is an educational objective which has been approved by the Supreme Court: "[S]chool authorities may well conclude that some kind of racial balance in the schools is desirable quite apart from any constitutional requirements" and those authorities have wide discretion in formulating school policy. (*Board of Education* v. *Swann* (1971) 402 U.S. 43, 45 [28 L.Ed.2d 586, 589, 91 S.Ct. 1284].) Therefore, the district was acting well within the realm of its discretion when it considered plaintiff's race as a factor in deciding to transfer her.

Plaintiff also attacks the district's use of the guidelines on the basis that they are permanent rather than temporary, and not directed at alleviating past discrimination, stating this makes them unconstitutional. Cases relied on by plaintiff (e.g., *Bakke, Weber*) for this proposition dealt with "stacked deck" programs: permanent, strict, quotas affecting important substantive rights. The guidelines were established to *balance* the racial composition of faculty. The *Kromnick* case, plaintiff's leading authority, itself stated that *maintaining* desegregated schools was a legitimate objective (*Kromnick* v. *School Dist. of Philadelphia, supra,* 555 F.Supp. at p. 254). To maintain a racial balance, the district must employ some means to ascertain the districtwide ethnic composition and then allocate its faculty to obtain an ethnic balance. To do less would deprive students of the opportunity to be educated in a system reflecting the society in which they are to live.

In spite of plaintiff's transfer from Marshall to Belvedere, both schools remained within the 20 to 45 percent guidelines; therefore, plaintiff argues, the district has failed to show its quota system is substantially related to the maintenance of desegregated schools. Plaintiff's original transfer was to Roosevelt, where her white race would have aided in bringing that school closer to compliance with the guidelines. As required by the contract, the district had first sought volunteers. It then properly considered all criteria listed in the contract, i.e., teachers' areas of competence, seniority and how to best meet the needs of the students, and then selected plaintiff. However, because of plaintiff's adverse reaction, she was, as required by the collective bargaining agreement, given a list of open positions and allowed to

request Belvedere. Although it was not required to do so, the district granted the request. Plaintiff herself frustrated the original transfer. She cannot now be allowed to complain that, because the transfer she engineered did not accomplish the district's original goals, the guidelines do not help to maintain racially balanced schools.

■ The expectation of being assigned to a particular school on the basis of seniority is not a protected right. (*Rutley* v. *Belmont Elementary Sch. Dist.* (1973) 31 Cal.App.3d 702, 708 [107 Cal.Rptr. 671].) Seniority is merely an economic right which can be bargained away. (*Tangren* v. *Wackenhut Services* (9th Cir. 1981) 658 F.2d 705, 707.) ■ The collective bargaining agreement in this case made seniority one of several factors to be considered in determining involuntary transfers. The district properly considered plaintiff's seniority.

■ Plaintiff contends she was improperly denied a hearing before the school board because her transfer deprived her of her property interests. However, plaintiff was not deprived of employment, she continued with the same salary, benefits and position at Belvedere. Because plaintiff has no vested right to teach in a specific school, she has no due process right to a hearing. (Cf. *Netwig* v. *Huntington Beach Union High Sch. Dist.* (1975) 52 Cal.App.3d 529, 532 [125 Cal.Rptr. 170].)

Plaintiff's argument that she was denied a hearing under district policy also lacks merit. She could have filed a grievance under the contract, as she did in 1979, or a complaint under the affirmative action plan. She elected to do neither.

Plaintiff contends the trial court improperly granted defendant's motion for a nonsuit. ■ The granting of a motion for nonsuit is warranted when, disregarding conflicting evidence, giving plaintiff's evidence all the value to which it is legally entitled, and indulging in every legitimate inference that may be drawn from the evidence, the trial court determines that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff. (*Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 118 [184 Cal.Rptr. 891, 649 P.2d 224].) In this case, there was no evidence proffered by plaintiff which would support a jury verdict in her favor. As the trial court correctly observed, there were no significant factual disputes and the issue to be determined was really one of law. Since no evidence was submitted to show discriminatory treatment against plaintiff, the court ruled correctly in granting defendant's motion for nonsuit. (*Ewing* v. *Cloverleaf Bowl* (1978) 20 Cal.3d 389, 395 [143 Cal.Rptr. 13, 572 P.2d 1155].)

Although breach of contract was neither pleaded as part of the complaint nor is it a federal issue, appellant argues on appeal that the school district "reneged" on a contract dated October 1, 1979. Actually, the October 1 document was executed as part of a settlement to resolve a grievance dispute over the 1979 transfer. That agreement, as appellant's own counsel recognized at trial, did not in any way protect Mrs. Bolin from future transfers. The grievance settlement merely recites that the district "agrees not to discriminate against the grievant on the basis of race, color, religion, sex, national origin, or age." It further states that the district denies that it has in fact discriminated against appellant at any time.

Because there were no factual issues for the jury to consider, the trial judge correctly applied the *Zaslawsky* case in determining that the school district was entitled to judgment as a matter of law.

The judgment is affirmed. Plaintiff's request for attorney's fees on appeal is denied.

McDaniel, J., and Rickles, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 11, 1984. Mosk, J., was of the opinion that the petition should be granted.