**Dolphus Jack BROWN**

v.

**Clarence JONES, Sheriff of Dallas County, Texas.**

**No. EP–73–CA–47.**

United States District Court,
W. D. Texas,
El Paso Division.

Nov. 4, 1974.

---

George E. Gilkerson, Travis D. Shelton, Lubbock, Tex., Joseph A. Calamia, John Fashing, El Paso, Tex., Phil Burleson, Dallas, Tex., for plaintiff.

Crawford C. Martin, Atty. Gen., Robert C. Flowers, Howard M. Fender, Asst. Attys. Gen., Austin, Tex., Bart Boling, Asst. Atty. Gen., El Paso, Tex., for defendant.

## MEMORANDUM OPINION

JOHN H. WOOD, Jr., District Judge.

On this 31st day of October, 1974, came on to be considered Petitioner's Writ of Habeas Corpus.

The petitioner, Dolphus Jack Brown, was indicted on May 3, 1967, by a Lubbock County, Texas, Grand Jury. The one count indictment alleged the murder with malice of petitioner's parents, D. J. and Birdie McCauley Brown, in Shallo-water, Texas, on April 18, 1967. A change of venue was granted and on October 16, 1968, petitioner was found guilty by a jury in the 34th District Court of El Paso County. The same jury imposed a sentence of thirteen years confinement. The conviction and sentence were affirmed by the Texas Court of Criminal Appeals in *Brown v. State*, 475 S.W.2d 938 (1971).

In March of 1972, petitioner filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Texas, the District in which Petitioner was at that time confined. Prior to the petition's being considered, the petitioner was transferred out of the Northern District and consequently the Honorable Sarah T. Hughes, United States District Judge, transferred the pending petition to the El Paso Division of the Western District of Texas pursuant to 28 U.S.C. § 2241(d). The petition was then considered by the late Honorable Ernest Guinn, United States District Judge, and denied without hearing on May 14, 1973. Notice of Appeal was filed and upon the District Court's denial of a Certificate of Probable Cause, such a certificate was granted by the United States Court of Appeals for the Fifth Circuit.

Declining to rule on the merits, the Fifth Circuit nevertheless reversed and remanded.[1] The basis for this decision was that Judge Guinn had relied solely on the opinion of the Texas Court of Criminal Appeals in reaching a decision and had not considered the trial record and transcript and the appellate record before the Texas Court of Criminal Appeals.

This Court has had the advantage of examining the entire record presented to the United States Court of Appeals for the Fifth Circuit. In addition to the able appellate briefs, this record includes an Appendix (3 volumes) that contains relevant portions of the proceedings in the state courts at both the trial and appellate level. While the petitioner, in

1. *Brown v. Jones*, 489 F.2d 1040 (5th Cir., 1974).

his opening brief in the Fifth Circuit (page 3), asserts that the facts are in dispute, this Court cannot determine the existence of any relevant factual dispute that would require an evidentiary hearing. The mixed questions of law and fact requiring application of a legal standard to a given set of facts are most certainly in dispute, but are issues for the Court which, absent a factual dispute, do not require an evidentiary hearing. *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

Petitioner has alleged four grounds of error in the state proceedings, each of which concerns a separate incident in the investigation and trial of petitioner.

In 1967, Mr. and Mrs. D. J. Brown lived on a farm near Shallowater, Texas, which is about 15 miles from Lubbock. At approximately 4:15 a. m. on the morning of April 18, 1967, the Lubbock County Sheriff's office responded to a call from petitioner Brown's uncle that they were needed at the Brown residence. Deputy Sheriffs Woodard and Knox, arriving at the Brown farm at 4:45 a. m., were met by petitioner Brown, his uncle A. C. Henderson and two ambulance drivers. With the apparent consent of Brown and his uncle, the officers entered the house and discovered the bodies of Mr. and Mrs. D. J. Brown, the victims of severe beatings with an unknown instrument.[2] Justice of the Peace Lamb and the Sheriff's office were then notified of the homicides.

Judge Lamb and other officers arrived at approximately 6:15 a. m. Petitioner Brown had meanwhile left the farm sometime between 5:30 and 6:00 a. m. After conducting a preliminary investigation Judge Lamb ordered the bodies of Mr. and Mrs. Brown removed to a funeral home and he and the other officers on the premises secured the house and departed at 8:00 a. m.

Half an hour later, Deputy Sheriff's Rice and Jackson arrived at the farm but did not enter the house as it was locked. They proceeded to the residence of Mr. Clyde Fowler, an uncle of petitioner Brown, and from him received a key to the Brown residence. With Mr. Edsel Merrell, another relative of the Brown family, Rice and Jackson returned to the farm sometime around 9:45 a. m. After attempts to open the kitchen door with the key given to them by Fowler had failed, Deputy Rice climbed through a window and opened the back door for Jackson and Merrell.

By the time this entry had been accomplished it was almost 10:00 a. m. Deputies Knox and Woodard, who had been the first officers on the scene and had departed earlier to investigate Brown's assertion that he had played in a poker game the previous evening, now returned to the farm and joined with Rice and Jackson in making a general search of the residence. In a laundry hamper near where the bodies were discovered, Deputy Knox found a shirt stained with what appeared to be blood. Knox took possession of the shirt, and it was later turned over to the District Attorney. After this discovery, the house was again secured and the officers departed.

At approximately 1:30, the authorities arrived at the farm a third time. A key provided by one of the relatives successfully opened the door and the authorities again made a search of the house. Near where the bodies of Mr. and Mrs. Brown had been discovered, the officers found two areas of carpeting that appeared to be stained with blood. These two sections were cut out and taken into custody. The house was once again locked and generally secured, and for a third time the authorities departed from the premises.

The fourth and final visit to the Brown farm by members of the Sheriff's office took place sometime between 4:00 and 5:00 p. m. on the afternoon of April 18th. With a key provided by Mr. Clyde Fowler, officers opened the trunk of a

---

2. The validity of this initial search is not contested by Brown and is not an issue in this case.

1964 Ford owned by the deceased Mr. Brown and leased to his insurance agency. A piece of wet trunk matting was then removed.

The shirt, pieces of carpeting and the trunk matting were later introduced at Brown's trial. Petitioner contends that these items were seized as the result of illegal warrantless searches and that their admission into evidence violated petitioner's rights under the Fourth and Fourteenth Amendments to the Constitution of the United States.

■ While the Texas Court of Criminal Appeals upheld the validity of the three contested searches on the basis of the "emergency" exception to the Fourth Amendment's requirement of a warrant,[3] this Court does not agree with the assertion of the petitioner that the only task for this Court is to accept or reject the legal conclusion of the Texas Court. The factual record in connection with this case has been exhaustively developed. For this reason, the Court has deferred to the state courts' findings of fact. In reviewing the state courts' legal conclusions, however, a federal district court is not bound by and indeed may not defer to these conclusions.

> Although the district judge may, where the state court has reliably found the relevant facts, defer to the state court's findings of fact, he may not defer to its findings of law. It is the district judge's duty to apply the applicable federal law to the state court fact findings independently. The state conclusions of law may not be given binding weight on habeas. *Townsend, supra,* at 318, 83 S.Ct. 745.

In examining the basis for these searches, therefore, this Court is not restricted to the emergency theory relied on by the state court.

■ Petitioner Brown asserts that at no time has it been agreed that the initial entry into the Brown house was lawful, and that instead this entry is merely not in issue (Petitioner's Reply Brief in

the Fifth Circuit, p. 9). The fact remains that the validity of this entry has never been disputed at any stage of these proceedings. Be that as it may, the circumstances confronting Deputies Woodard and Knox at the time they were initially summoned to the Brown farm not only gave them a right to enter the premises without a warrant, but also imposed upon them an obligation and duty to do so. *United States v. Birrell,* 470 F.2d 113 (2d Cir., 1972); *United States v. Barone,* 330 F.2d 543 (2d Cir., 1964); *Parsons v. State,* 271 S.W.2d 643 (1954), cert. denied 348 U.S. 837, 75 S.Ct. 36, 99 L.Ed. 660.

The point of contention is whether the delay between the initial entry into the Brown home and the subsequent entries which produced the evidence later admitted at trial required the officers to obtain a search warrant and, in the absence of such a warrant, made the subsequent searches and seizures unreasonable within the meaning of the Fourth Amendment.

■ In Appellant's Opening Brief in the Fifth Circuit at page 9, petitioner speaks of the necessity for a search warrant because the Brown home was a "constitutionally protected area." As has been pointed out, however, "[T]he Fourth Amendment protects people, not places". *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Likewise, the Fourth Amendment does not protect against warrantless searches *per se,* but only against unreasonable warrantless searches, and whether a particular search is unreasonable is something to be determined by the facts of a given case. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

■■ In the instant case, the authorities were confronted with a vicious double murder, committed by an unknown person or persons. While Brown lived at the house in question, it was owned by his murdered parents, and at no point was any objection made to the authori-

**3.** *Brown v. State, supra.*

ties' entering.[4] The Fourth Amendment protection against warrantless searches implies that for a search to be unreasonable it must be directed against a particular individual with standing to complain and violate the individual's reasonable expectation of privacy. See *Katz v. United States, supra*; *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). As well as the question of whom the search was directed against is the question of time. The investigation of any homicide is, of course, a matter of some urgency, and the authorities were bound to investigate any possible leads as soon as possible.

Chief Judge Friendly noted in *United States v. Birrell, supra* the rights of the police to conduct a warrantless search of a murder victim's abode:

"The police had a right, indeed a duty, to examine anything in Mrs. Belle's apartment that might cast light on her murder. Appellant's citation of such cases as *Kremen v. United States*, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876 (1957), and *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), misses the essential point that in them the object of the police activity was complaining of the scope of the search, * * * and it would be the sheerest formalism to require that police officers should obtain a warrant to search everything she had left behind and remove the property to the police station to that end if they considered this would provide added convenience and safety * * * there is no indication that the police knew or should have known that the objects taken were his, nor was the search directed at [the defendant]. 470 F.2d at p. 117.

Certainly in the case before this Court, the first two searches, which produced the carpet samples and shirt, are analo-gous to the situation described by Judge Friendly. The owners of the home, Mr. and Mrs. Brown, were the victims of homicides, not a search. At the time these searches were made, the authorities had no definite suspects. The Fourth Amendment is designed to prevent misconduct by the authorities and restrain possible infringements on a citizen's right to privacy. But the search complained of here is not like the "fishing expedition" in search of possible criminal activity. In this case, the authorities were confronted by a crime already committed.

■ Time was of the essence in this case since the unknown assailant might be fleeing farther away with every passing moment, and possible evidence leading to identification might be laying at hand. The pointlessness of obtaining a search warrant at this juncture is made clear by the fact that the authorities had no idea what they were looking for. Had a warrant been obtained, it would be a sham, since the object of the search would have been so broad as to be meaningless. At the same time, the delay between searches so vigorously objected to was, in reality, a matter of hours and not so extended as to constitute distinct and separate investigations. Under these circumstances, the Court is compelled to conclude that the searches which produced the shirt and carpet samples were reasonable, and that any infringement of petitioner's incidental expectation of privacy did not constitute a violation of his rights under the Fourth and Fourteenth Amendment.

There remains the search of the 1964 Ford. The record discloses that by the time the trunk matting was removed from this automobile, Brown was under arrest. The focus of the investigation had changed from a general nature to one directed against Brown himself. This changing focus combined with petitioner's reasonable expectation of priva-

4. Neither party has really addressed the question of Brown's standing to contest these searches. While Brown did not own or have an interest in the house and car in question, however, it would seem clear that he had a reasonable expectation of freedom from intrusion with regard to both. *United States v. Bell*, 457 F.2d 1231 (5th Cir., 1972).

cy with regard to the vehicle would, under normal circumstances require officers to obtain a warrant prior to any search.

■ The circumstances in this case, however, were not normal. The owners of the car had been slain, and while petitioner had been arrested, the preliminary investigation into these murders had by no means ended. As with the earlier searches, the authorities had no idea what they were looking for or what they might find, but were working under pressure to determine the as yet unknown means by which the victims had been killed. Under these circumstances, the Court finds that the investigation was of a continuing nature being conducted in an emergency type situation. The search was, therefore, reasonable.[5]

Subsequent to the blood-stained shirt being discovered by Deputy Knox, the District Attorney asked Brown to come to his office. The petitioner was not under arrest at this time and the identity of the murderer was still unknown. The investigation was of a general nature and no one particular person appeared to be suspect. The District Attorney, who now had possession of the shirt, did not know who it belonged to or whether it was in any manner relevant to the investigation. The only thing known was that the shirt was stained with what appeared to be blood.

Petitioner's contentions that the investigation had focused upon him at this point in time are not supported by the record. Crucial links in the chain of evidence against petitioner had yet to be developed, such as the discovery of a bundle of clothes in a nearby park.

Once Brown had voluntarily come to the office of the District Attorney with his uncle, he was asked if he knew who the shirt in question belonged to. Brown replied that it was his. After the interview, Brown was allowed to leave. It is undisputed that the petitioner was not given his *Miranda* warnings during this interview. See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ Petitioner contends that the failure of the authorities to give him his *Miranda* warnings prior to this incriminating admission barred any testimony concerning this admission. For substantially the same reasons as outlined in *Brown v. State, supra,* the Court does not agree. The record discloses that the interview was of a non-custodial nature in a situation where petitioner was not yet suspected of having committed the crime being investigated.

■ It is further alleged that petitioner's Sixth Amendment rights to an impartial jury and confrontation with witnesses against him were infringed by an alleged remark by a bailiff to the jury to the effect that the petitioner was guilty but that the state had failed to prove its case. It was never established that the statement was in fact made. Assuming, *arguendo*, that it was, the petitioner has failed to carry his burden that the statement was in any manner prejudicial or even considered by the jury. *Adams v. United States*, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942).

■ Petitioner's final contention challenges the constitutionality of the Texas procedure whereby a defendant must file an application for probation prior to trial.[6] While the procedure may

5. The cases cited by the petitioner, *Root v. Gauper*, 438 F.2d 361 (8th Cir., 1971) and *United States v. Davis*, 423 F.2d 974 (5th Cir., 1970), are distinguishable. In *Root* the initial entry by the police was held to be unlawful, as the victim had already been removed from the scene and the officers knew who had committed the crime and the means used. In *Davis*, federal agents were involved in a gun fight with the defendants and the latter were subsequently arrested. When an initial contemporaneous search did not disclose the weapon used against the agents, everyone left the scene. The officers later returned to search for the pistol and found it in the yard of one of the defendants. The 5th Circuit held that the emergency ended at the time agents had initially departed the scene. Unlike the case at bar, the agents not only knew who had committed the crime but were in fact searching for the known instrumentality used in the assault on the agents.

6. Art. 42.12, Sec. 3a V.A.C.C.P.

or may not be wise, it is not this Court's function to judge a statute's wisdom. The application for probation is not evidence and assuming some reference were made to it during voir dire examination of a jury panel, this Court cannot conclude that an appropriate instruction regarding the nature of the application would be ignored.[7] The issue is, in any event, essentially one of state procedure and does not present a substantial constitutional question.[8]

For these reasons, the Court finds that the Writ of Habeas Corpus filed in the above styled and numbered cause is without merit, and it is hereby and in all things Denied.

7. The application in this instance was not filed before trial so that no reference was made to any application at the time the jury panel was examined.

8. Certainly this case bears no relation to *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) in which a jury was hearing the confession of a defendant at the same time they were considering the voluntariness of the confession.