Jerry **COVINGTON** and Don
Elliff, Plaintiffs,

v.

**BEAUMONT INDEPENDENT SCHOOL DISTRICT, Defendant.**

No. B–88–820–CA.

United States District Court,
E.D. Texas,
Beaumont Division.

May 30, 1989.

---

Jefferson K. Brim, III, Brim & Arnett, Austin, Tex., for plaintiffs.

Donald M. Hudgins, Hudgins, Hudgins & Warrick, Houston, Tex., and Tanner T. Hunt, Wells, Peyton, Beard, Greenberg, Hunt & Crawford, Beaumont, Tex., for defendant.

## MEMORANDUM OPINION

SCHELL, District Judge.

This Court must review *Bakke* and its progeny in assessing plaintiffs' allegation of unconstitutional race discrimination against defendant school district. Plaintiffs are high school teacher-coaches who allegedly were the victims of illegal discrimination when they were demoted as coaches and replaced by members of another race. The case is currently before the Court on cross motions for summary judgment, the disposition of which is made possible by defendant's admission that its actions in reassigning plaintiffs were indeed racially motivated. Defendant, however, contends that its decision is constitutionally permissible in order to maintain racial integration among its coaching staffs. The sole issue before the Court is whether this decision violates the Fourteenth Amendment Equal Protection Clause. Finding that defendants acts in reassigning plaintiffs are indeed constitutionally proscribed, the Court grants plaintiffs' Motion for Interlocutory Summary Judgment and denies defendant's Motion for Summary Judgment.

## I. BACKGROUND

The parties' agreement to some twenty-five stipulations facilitates the factual basis of this opinion. Plaintiffs are teachers and coaches at West Brook High School in Beaumont, Texas. Covington, a white male, and Elliff, a hispanic male, executed contracts with defendant, Beaumont Independent School District (BISD), for the performance of professional duties during the 1988–89 school year. They are currently performing pursuant to these contracts.[1]

---

1. On May 1, 1989, Elliff began performing      duties as head football coach in another school

Plaintiffs' principal employment with BISD is full-time classroom teaching. Their coaching duties represent incidental supplementary employment. Plaintiffs' contracts specifically subject them to "transfer, assignment and reassignment of positions or duties at any time during the contract term...."

Another provision of plaintiffs' contracts governs coaching assignments: "If supplemental duties, e.g., coaching, are assigned, they will be compensated according to District's supplemental schedule, but such duties create no property right, and may be terminated at any time." As coaches, Covington and Elliff each received a contract supplement detailing a salary supplement for their coaching responsibilities. BISD confers assistant coaches assignments for one school year only. These assignments carry no guarantee of coaching assignments in subsequent years.

BISD is a unitary school system. Its prolonged route to unitary status generated years of traumatic desegregation.[2] Finally, however, after years of litigation which need not be recounted here, the Court declared BISD unitary in 1984. *United States of America v. Texas Educ. Agency*, No. B–6819–CA (E.D.Tex. July 19, 1984) (Memorandum Opinion and Order) [hereinafter *USA v. TEA*]. At that time, the Court closed the desegregation case, ordered the dissolution of all desegregation orders regarding ratios, student assignment, etc., and vested the responsibility of maintaining unitary status with the school board. *Id.*[3]

This litigation concerns events which occurred early in the 1988 football season at West Brook High. Covington and Elliff were both originally assigned as assistant varsity football coaches. In early August, 1988, a local newspaper published an article revealing the absence of black coaches on the varsity football coaching staff. Prior to this article, BISD administrators responsible for coaching assignments were unaware of the lack of black coaches on the varsity staff.

On August 18, 1988, the Board of Trustees of BISD directed Superintendent Dr. O.C. Taylor to reassign[4] two coaches from

district and currently teaches only half of each school day at West Brook.

2. Beaumont formerly contained two separate school districts, BISD and South Park Independent School District (SPISD). Originally, both school systems were parties to separate cases brought by the Government seeking desegregation.

Events occurred in 1983 which led to the emergence of only one school district in Beaumont, BISD. Former BISD petitioned for an election to abolish itself pursuant to Tex.Educ. Code Ann. § 19.152 (Vernon Supp.1984). In the election, former BISD was voted abolished, and SPISD thereafter annexed the territory comprising former BISD pursuant to *id.* § 19.155(b). After annexation, SPISD formally changed its name to Beaumont Independent School District. The Court then consolidated the desegregation cases.

3. The Court's final order noted that "faculty and staff are integrated in *every* school in the new BISD." *Id.* at 16.

Post-desegregation accusations of race discrimination in the selection and assignment of coaching personnel have occurred. In February, 1986, BISD merged its four high schools into its currently existing two high schools, Central High and West Brook High. Coaching staffs were reassigned at that time to fit the needs of the merger. Black coaches demoted during this reassignment filed grievances with the Beaumont Teachers Association (BTA) alleging discrimination in the reassignments, and, on April 9, 1986, the BTA formally complained to the Texas Education Agency (TEA). The TEA's report of June 6, 1986, states, in relevant part: "It appears that the percentages of minority major varsity head coaching positions are low. This is especially true of boys varsity head coaches of which only 21.4% are minority." That report recommended the development by BISD of formal objective, non-discriminatory criteria governing the reassignment of coaches in the future and the inclusion of a minority on the selection committee for all major varsity head boys and girls positions.

Another complaint alleged, among other things, discrimination against black coaches in the assignment of head coaches for the 1987–88 school year. After an investigation, TEA reported on January 25, 1988, that BISD had provided statistics which refuted this allegation. This Court expresses no opinion on allegations of discrimination which are not the subject of this lawsuit.

4. The parties sharply disagree on whether the coaching changes are properly characterized as "reassignments" or "demotions." As will be explained later, the issue is irrelevant to this Court's holding.

the West Brook varsity football staff to the sophomore football staff and to replace them with two black coaches from the sophomore staff. Covington and Elliff were selected for displacement because they had the least seniority among members of the varsity staff. On August 19, 1988, school administrators formally notified plaintiffs that they were being reassigned so that two black coaches could be assigned to the varsity staff, and that they had been selected for reassignment because they were not black and because they had the least seniority among varsity coaches. Plaintiffs experienced no reduction in compensation or benefits as a result of the reassignment, and their teaching assignments for the 1988–89 school year were unaffected.

BISD assistant football coaches have no coaching responsibilities regarding football following the close of the fall football season other than those concerning off-season training for football athletes in the spring semester. Off-season training consists of weight training, agility drills, and general conditioning drills held in a one-hour athletic period during normal school hours. Sophomore football off-season is held during first period; off-season training for varsity and junior varsity football occurs during fourth period.[5] West Brook High has no spring training program for football.

Covington and Elliff commenced this litigation[6] shortly following the events of August, 1988, which are the basis of this lawsuit. They claim that defendant's acts violate 42 U.S.C. §§ 1981 and 1983.[7] This opinion is limited to the sole issue raised by Plaintiffs' Motion for Interlocutory Summary Judgment: whether BISD's acts in question offend the Equal Protection Clause.[8] Today's ruling disposes of the parties' cross motions by granting plaintiffs' motion and denying defendant's motion.

## II. EQUAL PROTECTION

The Equal Protection Clause of the Fourteenth Amendment provides: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Equal protection rights are personal rights guaranteed to the individual. *City of Richmond v. J.A. Croson Co.*, —— U.S. ——, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989) (quoting *Shelley v. Kraemer*, 334 U.S. 1, 22, 68 S.Ct. 836, 846, 92 L.Ed. 1161 (1948)). Classifications of citizens based upon race are reviewable under the Equal Protection Clause. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 1846, 90 L.Ed.2d 260 (1986).

The Supreme Court has forcefully maintained that " '[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.' " *Regents of Univer-*

---

**5.** Deposition of West Brook varsity football head coach Jerry Hentschel, transcript at 7–8.

**6.** BISD has formal grievance procedure policies. Neither Covington nor Elliff completed grievance procedures, although Elliff filed a grievance which he failed to pursue. The procedure is available for virtually every type of employee grievance. Defendant raises plaintiffs' failure to exhaust administrative remedies as an affirmative defense warranting dismissal in its Original Answer, but argues this point in its motion only insofar as it impacts any claim of denial of procedural due process. At any rate, plaintiffs have not claimed they were denied procedural due process, and § 1983 plaintiffs are not required to exhaust administrative remedies before commencing litigation. *Patsy v. Board of Regents*, 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982).

**7.** Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom or usage of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. BISD does not contest the applicability of § 1983. Plaintiffs' § 1981 claim is not addressed by either motion and is unnecessary to this Court's ruling.

**8.** Defendant also argues that plaintiffs suffered no denial of due process, which is not at issue in this opinion.

*sity of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978) (quoting *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943)). Racial classifications, unless reserved for remedial settings, may actually promote "notions of racial inferiority and lead to a politics of racial hostility." *City of Richmond,* 109 S.Ct. at 721. " 'Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination.' " *Wygant,* 106 S.Ct. at 1846 (quoting *Bakke,* 98 S.Ct. at 2748). The standard of review under the Equal Protection Clause is not dependent upon the race of those burdened or benefited by a particular classification. *City of Richmond,* 109 S.Ct. at 721.

Thus, race-based classifications are proscribed unless justified under the most restrictive of constitutional standards of review, strict scrutiny. First, the racial classification must be justified by a compelling governmental interest. Second, the means chosen by the State to effectuate its purpose must be narrowly tailored to the

achievement of that goal. *Wygant,* 106 S.Ct. at 1846. BISD admits that its decision to reassign plaintiffs to the sophomore coaching staff because they are "not black" [9] was made on the basis of the race of those coaches involved.[10] As discussed later, however, defendant contends that its racially motivated actions can survive strict scrutiny and are constitutionally permissible in order to fully maintain its integrated status.

At the outset, this Court addresses BISD's contention that the Equal Protection Clause is unavailable because plaintiffs "are not being denied anything." [11] BISD argues that its actions denied plaintiffs nothing because their teaching duties remained constant and their compensation and benefits were unchanged.[12] Defendant further reminds the Court that plaintiffs' contracts specifically subject them to reassignment at any time during the contract term. The parties also wage a fierce battle on the issue of whether the coaching changes constitute "demotions" or merely "reassignments." [13] Defendant further as-

---

**9.** Stipulation no. 8.

**10.** Stipulation no. 7 (superintendent instructed to replace two varsity coaches with two black coaches from sophomore staff); stipulation no. 8 (plaintiffs told being reassigned because not black); defendant's response to plaintiffs' motion at 4 (reassignment of plaintiffs an attempt to achieve integration); *id.* at 7 (goal of providing integrated education); defendant's brief in support of motion at 3 (plaintiffs reassigned because varsity staff had no black coaches); *id.* at 4 (reassignments needed because of racial composition of varsity team); *id.* at 17 (school board moved quickly to remedy an all-white coaching staff); defendant's reply to plaintiffs' response to defendant's motion at 4 (reassignments necessary to overcome racially imbalanced varsity staff).

**11.** Defendant's response to plaintiffs' motion at 3; *see also* brief of defendant in support of motion at 9–13.

**12.** Defendant attempts to distinguish the Supreme Court cases of *Wygant* and *City of Richmond* by asserting that, in those cases, citizens were being removed from teaching positions and denied contracts, respectively.

**13.** BISD argues that plaintiffs were not "demoted" under the standard promulgated by the Fifth Circuit in *Singleton v. Jackson Mun. Sepa-*

*rate School Dist.,* 419 F.2d 1211, 1218 (5th Cir. 1970). In *Singleton,* the Fifth Circuit established standards to govern the problems relating to the desegregation of faculties in the context of consolidation following the dismantling of dual school systems. The Fifth Circuit held that staff reductions which occur pursuant to desegregation must be based on objective and reasonable nondiscriminatory standards. *Id.* at 1218. *Singleton* standards, which are limited to the particular problem of faculty reductions pursuant to desegregation, were utilized during the desegregation of BISD. *See USA v. TEA* at 21.

Under these standards, a "demotion" includes any reassignment 1) under which the staff member receives less pay or has less responsibility than under the assignment he held previously, 2) which requires a lesser degree of skill than did the assignment he held previously, or 3) under which the staff member is asked to teach a subject or grade other than one for which he is certified or for which he has held substantial experience within a reasonably current period. *Id. Singleton* guidelines, however, are inoperative once a school system is declared unitary, and, as discussed later, a school board cannot continue to make personnel decisions on the basis of racial ratios once faculty desegregation has been achieved by remedial ratios based on race. *Lee v. Russell County Bd. of Educ.,* 563 F.2d 1159, 1163 (5th Cir.1977). The Court in fact ordered the dissolution of all desegregation

serts that its decision was not an "adverse employment decision effecting the careers and professional reputations of the Plaintiffs." [14] In sum, as BISD argues, plaintiffs received no disparate treatment upon which to base an equal protection claim.

■ BISD's interpretation of this aspect of equal protection is misplaced. Equal protection is triggered by a classification or decision based upon race. *See City of Richmond,* 109 S.Ct. at 721; *Bakke,* 98 S.Ct. at 2746–48.[15] Transfers, assignments, and reassignments of personnel on the basis of race are reviewable under the Fourteenth Amendment.[16] The Supreme Court has specifically held that decisions by administrators of public schools based upon race are reviewable. *Wygant,* 106 S.Ct. at 1846. Invocation of equal protection rights is therefore not contingent upon any talismanic requirement that a citizen be denied any material matter such as pay, benefits, or a job, or that he be "demoted" or suffer injury to his reputation or career. The portion of plaintiffs' contracts subjecting them to reassignment at any time is, of course, subject to constitutional imperatives. *McCormick v. Attala County Bd.*

*of Educ.,* 407 F.Supp. 586, 594 (N.D.Miss.), *vacated on other grounds,* 541 F.2d 1094 (5th Cir.1976). The issue of whether the coaching changes in question constitute "demotions" or "reassignments," or were "adverse employment decisions" affecting plaintiff's reputations and careers, is therefore irrelevant.[17]

■ Defendant's acts in reassigning plaintiffs because of their race indeed denied rights secured to them by the Fourteenth Amendment.[18] Defendant denied plaintiffs the right to maintain their positions as assistant varsity football coaches at West Brook High because of the color of their skin. More significantly, plaintiffs were denied their meaningful constitutional right to be free from subjection to suspect racial classifications absent a demonstrable justification compelling enough to survive strict scrutiny.

Defendant's acts are therefore constitutionally impermissible unless justified by a compelling governmental interest the means to the effectuation of which are narrowly tailored. *Wygant,* 106 S.Ct. at 1846. The Supreme Court's recent decision

---

orders implementing *Singleton* standards when unitary status was declared. *USA v. TEA* at 21.

**14.** Brief in support of motion at 12. Defendant strongly contends that plaintiffs have no constitutional claim because they suffered no damage to their professional careers and reputations. *See id.* at 12–13; defendant's reply to plaintiffs' response at 1–4. In furtherance of this contention, defendant very recently filed its supplemental memorandum revealing that Elliff was recently awarded a head football coaching position in another nearby school system. Elliff counters with his affidavit pointing out that his new position is with a much smaller school system and that he will receive less pay in his new position.

**15.** *See also McCormick v. Attala County Bd. of Educ.,* 407 F.Supp. 586, 594 (N.D.Miss.1976), *vacated on other grounds,* 541 F.2d 1094 (5th Cir.1976).

**16.** *See Cygnar v. City of Chicago,* 865 F.2d 827 (7th Cir.1989); *Barhold v. Rodriguez,* 863 F.2d 233 (2nd Cir.1988); *Reynolds v. Abbeville County School Dist.,* 554 F.2d 638, 641–42 (4th Cir. 1977); *Rolfe v. County Bd. of Educ.,* 391 F.2d 77, 79–80 (6th Cir.1968); *Allen v. City of Mobile,* 331 F.Supp. 1134 (S.D.Ala.1971), *aff'd,* 466 F.2d 122 (5th Cir.1972).

**17.** These factors may, of course, be relevant to the amount of damages recoverable.

**18.** Defendant urges that its decision is permissible under *Riggs v. Laurens Dist. 56,* 271 S.C. 463, 248 S.E.2d 306 (1978), *cert. denied,* 442 U.S. 913, 99 S.Ct. 2831, 61 L.Ed.2d 280, and *Bolin v. San Bernadino City Unified School Dist.,* 155 Cal. App.3d 759, 202 Cal.Rptr. 416 (Cal.Ct.App.1984). In *Riggs,* a teacher reassigned because she was white and because of her lack of seniority resigned after refusing to transfer and sued, alleging reverse race discrimination in her transfer. *Riggs* is distinguishable because the points discussed were limited to the questions of whether the defendant had breached its contract and whether the transfer violated 42 U.S.C. § 1981. The court concluded that the plaintiff had been denied no contractual right, an issue not present in the instant case.

In *Bolin,* the court upheld the transfer of a white teacher who was selected for transfer on the basis of ethnicity, credentials, student needs, and seniority. 155 Cal.App.3d at 764, 202 Cal. Rptr. at 420. The court upheld the transfer under the Equal Protection Clause. A key to this decision is that the school system was operating under racial quota guidelines established by the Office of Civil Rights, and, unlike BISD, had not been declared integrated.

in *City of Richmond* concerns one of the most potentially legitimate uses of race-based classifications: remedying the effects of prior discrimination. Plans and programs purportedly accomplishing this goal are frequently termed "affirmative action" programs.

Richmond, Virginia, adopted a Minority Business Utilization Plan that required contractors to subcontract at least 30% of each contract to Minority Business Enterprises (MBEs), businesses from anywhere in the country owned 51% or more by various minority citizens. Contractors could obtain a waiver of the 30% requirement by showing that qualified MBEs were either unavailable or were unwilling. The plaintiff, J.A. Croson Co., had contracted with Richmond, but lost its contract when it failed to meet the 30% requirement and was denied a waiver.

The Supreme Court struck down Richmond's plan as violative of the Equal Protection Clause. 109 S.Ct. at 730.[19] The Court made clear that assertions of past societal discrimination as well as past discrimination in the construction industry as a whole are insufficient to justify remedial uses of race-based classifications. *Id.* at 722–23. Rather, legitimate discrimination by the city in requiring that subcontracts be awarded to MBEs would be confined to remedying identified discrimination in the Richmond construction industry, evidence of which the city had failed to provide. *Id.* at 727.[20]

In *City of Richmond,* the Supreme Court reiterated some of the same principles it utilized a few years earlier in invalidating an affirmative action plan in *Wygant.* In *Wygant,* a collective bargaining agreement between the school board and the teachers' union contained a layoff provision providing that if teachers were laid off, those with the most seniority would be retained, except that at no time would the percentage of minorities laid off exceed the percentage of minorities employed at the time of the layoff. Eventually, the effect of the provision was that nonminority teachers were laid off who had more seniority than some minority teachers retained. In striking down the layoff provision, the Court held that there must be evidence of prior discrimination by the governmental unit involved before race-based classifications would be allowed for remedial purposes, and that societal discrimination alone is insufficient to justify racial classifications. 106 S.Ct. at 1847–48. Significantly, the Court repudiated the "role model theory" advanced by the school board as a justification for the provision, under which theory racial classifications in public school faculties are arguably justified to provide minority role models for minority students. *Id.* at 1847.[21]

### A. Maintenance of Unitary Status

This Court need not probe the delicate contours of the legitimate uses of remedial race-based classifications. Defendant has no affirmative action program, and it has not argued that it reassigned Covington and Elliff in order to remedy identified past discrimination against black coaches in the selection or assignment of coaching personnel.[22] Rather, defendant contends that, al-

---

**19.** Before denouncing the Richmond plan, the Court's plurality held that state and local subdivisions have the authority to remedy the effects of their own identified past discrimination and of private discrimination within their own jurisdictions. *Id.* at 720.

**20.** The Court also held that the Richmond plan was *not narrowly tailored to remedy past discrimination. Id.* 109 S.Ct. at 729.

This Court's brief capsule of the Supreme Court's landmark decision is not intended to fully explore the sensitive area of remedial race classifications. The reader is urged to review *City of Richmond* in its entirety.

**21.** The role model theory failed because the statistical disparity between students and teachers was not probative in demonstrating the kind of prior discrimination which would have warranted remedial classifications, and because, since the theory had no relation to some basis for believing a constitutional violation had occurred, it could be used to justify race-based decisions essentially limitless in scope and duration. *Id.* at 1847–48.

**22.** Although BISD had no formal affirmative action plan, it has apparently employed a "tradition" of having white and black coaches on each varsity staff. Deposition of BISD Athletic Director Paul Carswell, transcript at 14. This

though the Court declared it unitary and closed its desegregation case in 1984, it reassigned plaintiffs in furtherance of its continuing duty "to be mindful of [its] responsibility to maintain a fully integrated system, including all employees ... who work directly with students...." [23] In other words, BISD reassigned Covington and Elliff solely for the purpose of including black coaches on West Brook High's varsity football staff, which was believed warranted in order to maintain racial integration among its coaching staffs.

Standing alone,[24] this proffered justification would exculpate racial classifications for the sake of racial classifications, which was expressly denounced in *Bakke.* In *Bakke,* the Supreme Court considered the validity of a racial quota system employed in the admissions process by the University of California at Davis Medical School. The school's plan reserved 16 out of 100 places in each year's entering class for members of certain minority groups. The medical school denied Bakke admission, even though it admitted certain minority citizens whose scores were significantly lower than Bakke's.

Justice Powell's opinion [25] denounced the racial quota under an equal protection analysis, making clear that a goal of ethnic diversity, standing alone, would not be tolerated:

If petitioner's purpose is to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin, such a preferential purpose must be rejected not as insubstantial but as facially invalid. Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids.

98 S.Ct. at 2757.[26] Although BISD may have been sincerely motivated by a perceived post-desegregation duty to always maintain racial integration among its faculties, the Supreme Court has forcefully denounced racial classifications made solely to include members of a particular race.

Defendant's argument raises interesting questions concerning the scope of a unitary school district's post-desegregation responsibilities. The integration of a dual school system is itself a remedial measure. It remedies the unconstitutional discrimination against minorities inherent in the operation of a segregated school system. *See Brown v. Bd. of Educ.,* 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954). When a racially discriminatory school system is found to exist, the local school board must undertake the affirmative duty to implement whatever steps are needed to convert to a unitary school system and eliminate all vestiges of racial segregation. *See Green v. County School Bd.,* 391 U.S. 430, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968); *Brown v. Bd. of Educ.,* 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955). In so doing, the local school system may usually initially use racial classifications in effectuating this affirmative duty. *Wygant,* 106 S.Ct. at 1848. These permissible classifications may take such forms as

Court expresses no opinion on BISD's informal policy.

This Court also expresses no opinion on the aforementioned complaints of discrimination against blacks in coaching assignments filed with BISD which are not at issue in this lawsuit.

**23.** Defendant's reply to plaintiffs' response at 4–5. The Court, in closing the desegregation case, held that all desegregation matters are now "entrusted to the school board members guided in their conduct by the constitution they have sworn to uphold." *USA v. TEA* at 21.

**24.** Defendant also argues the goal of providing an "integrated educational experience" to students. This different goal is discussed later.

**25.** *Bakke* produced an interesting division of Justices. Justice Powell and the four dissenting

Justices believed that the case should be decided under an equal protection analysis. They obviously reached different conclusions. The remaining members of the majority, in an opinion concurring in part and dissenting in part, would have found the racial quota violative of § 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and would therefore have avoided the constitutional issue. 98 S.Ct. at 2808–15 (Stevens, J., concurring in part and dissenting in part).

**26.** No other Justices joined in the lead opinion. Justice O'Connor's lead opinion in *City of Richmond,* however, cited *Bakke* and discussed Justice Powell's rationale with approval. 109 S.Ct. at 722.

student assignment, attendance zones, and faculty racial ratios. *See North Carolina State Bd. of Educ. v. Swann*, 402 U.S. 43, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971); *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 1279–83, 28 L.Ed.2d 554 (1971); *United States v. Montgomery County Bd. of Educ.*, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969); *Carter v. West Feliciana Parish School Bd.*, 432 F.2d 875, 878–79 (5th Cir. 1970).[27]

The affirmative duty to desegregate, however, has never granted school boards a license to make racial classifications that surpass the remedial purpose. The duty and authority to integrate the public schools extend no further than is necessary to remedy the constitutional violations which existed prior to desegregation.[28] Once a school system is integrated, the prior discrimination has been cured and race-based classifications are thereafter no longer remedial of pre-unitary violations. *See Swann*, 91 S.Ct. at 1283–84. When the Court declared BISD unitary in 1984, the remedy for constitutional violations which existed prior to the declaration of unitary status matured and the affirmative duty concluded.[29] The Court's final order in the desegregation case specifically referred to faculty: "[F]aculty and staff are integrated in *every* school in the new BISD." *USA v. TEA* at 16. No one here asks the United States District Court for the Eastern District of Texas to reopen the desegregation case or in any way asserts that BISD has engaged in resegregative conduct.

The Fifth Circuit has clearly stated that once faculty desegregation is initially accomplished through the use of valid racial classifications such as faculty ratios, faculty decisions should thereafter turn on objective, non-racial criteria: "[O]nce a unitary system has been established the system-wide [faculty] racial ratio may thereafter change from time to time as a result of non-discriminatory application of objective merit standards in the selection and composition of faculty and staff." *Carter*, 432 F.2d at 878–79.[30] Personnel decisions must be based solely on objective, non-racial standards once integration is complete. Thereafter, the ensuing ebb and flow in the racial compositions of faculties is perfectly permissible and in fact has been contemplated by the Fifth Circuit. *Id.* Defendant's attempt to maintain the presence of a given race for the mere sake of that presence is exactly the kind of "year-to-year calibration" that the Supreme Court has held unnecessary:

'At some point these school authorities and others like them should have achieved full compliance with this Court's decision in *Brown I.... Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accom-

---

27. If school authorities fail to carry out their affirmative duty, judicial authority may be invoked. *Swann*, 91 S.Ct. at 1276.

28. *See, e.g., City of Richmond*, 109 S.Ct. at 737–38 (Scalia, J., concurring); *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 2950–51, 61 L.Ed.2d 666 (1979); *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977); *Pasadena Bd. of Educ. v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 2704, 49 L.Ed.2d 599 (1976); *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974).

29. The line beyond which racial classifications are no longer justified as being remedial may not in every case be bright. The key is whether such classifications serve a remedial purpose. The Court's final desegregation order in 1984 was unequivocal in terminating any justification for race-based remedial action in the selection and assignment of faculty members because it declared BISD unitary, stated that faculty and staff were fully integrated in every school in the BISD, and dissolved all orders which implemented permissible race-based classifications. *USA v. TEA* at 16, 21.

30. *See also Lee v. Russell County Bd. of Educ.*, 563 F.2d 1159, 1163 (5th Cir.1977) ("[A]fter faculty desegregation has been effectuated by remedial orders based on racial ratios the school board cannot continue to make personnel decisions on the basis of such racial ratios."). Two circuit courts have flatly held that the Fourteenth Amendment forbids discrimination in school faculty decisions. *Reynolds v. Abbeville County School Dist.*, 554 F.2d 638, 641–42 (4th Cir.1977); *Rolfe v. County Bd. of Educ.*, 391 F.2d 77, 79 (6th Cir.1968).

plished and racial discrimination through official action is eliminated from the system.'

*Wygant*, 106 S.Ct. at 1847 (specifically referring to faculty racial compositions) (quoting *Swann*, 91 S.Ct. at 1283–84).

The parties have stipulated that BISD administrators responsible for coaching assignments were unaware of the absence of black coaches on the varsity staff before the aforementioned newspaper article appeared. If, in fact, school administrators selected the initial varsity staff on the basis of objective and non-discriminatory standards, nothing more was required of BISD. There is no allegation, and the Court's file contains no evidence, that the initial failure to include black coaches on the varsity staff was in any way discriminatory against black coaches. Assuming the initial assignments were made on a completely objective basis, the composition of the initial varsity staff was consistent with the Fifth Circuit's observation that "the system-wide [faculty] racial ratio may thereafter change from time to time as a result of non-discriminatory application of objective merit standards...." *Carter*, 432 F.2d at 878–79.

Nor can this Court sanction defendant's contention that racial classifications of faculty members are part of a continuing duty that survived the close of BISD desegregation. Again, the permissible use of race-based remedies in school desegregation is limited by the scope of the prior constitutional violations.[31] The Court's previous unequivocal language in declaring BISD unitary, in closing the desegregation case, in dissolving all desegregation orders implementing permissible race-based classifications, and in declaring that faculty and staff are integrated in every school,[32] forecloses the argument that the racially motivated reassignments of Covington and El-liff were in furtherance of remedying pre-unitary discrimination.[33]

Furthermore, BISD has not argued that plaintiffs' reassignments were remedial of any prior violation.[34] Defendant's theory would project racial classifications of faculty members endlessly into the future with "no logical stopping point." *See Wygant*, 106 S.Ct. at 1847. In the absence of a constitutionally legitimate purpose, these classifications accomplished nothing but "discrimination for its own sake." *Bakke*, 98 S.Ct. at 2757. BISD definitely has an interest in maintaining integrated faculties, but, absent constitutional justification, it must use race-neutral criteria and means to accomplish this ongoing objective or run afoul of constitutional imperatives.

In sum, BISD cannot constitutionally continue to make race-based faculty decisions in the name of integration. Now that it is fully unitary, BISD must " 'do away with all governmentally imposed distinctions based on race.' " *Wygant*, 106 S.Ct. at 1848 (referring to schools) (quoting *Palmore v. Sidoti*, 466 U.S. 429, 104 S.Ct. 1879, 1881–82, 80 L.Ed.2d 421 (1984)). Any race-based faculty decision is now warranted only by a compelling governmental interest other than remedying pre-unitary discrimination. This Court now addresses another interest.

### B. Educational Benefits to BISD Students

■ Defendant also contends that the displacement of plaintiffs is justified in order to provide an "integrated educational experience" to BISD students. There is substance to the assertion that educational benefits to students flow from a racially diverse faculty. The Supreme Court's decision in *City of Richmond*, however, precludes this Court from considering whether

---

**31.** *City of Richmond*, 109 S.Ct. at 738 (Scalia, J., concurring); *see Wygant*, 106 S.Ct. at 1848.

**32.** *USA v. TEA* at 16, 21.

**33.** In other school systems, it is conceivable that the need for remedial measures could survive the close of formal desegregation. For example, in a non-court supervised desegregation,

achievement of unitary status might occur in slow stages during which there might not be a firm cutoff point, such as occurred with BISD in 1984.

**34.** BISD points to no prior discrimination against black coaches which warrant the reassignments of plaintiffs for remedial purposes.

this goal is a governmental interest sufficiently compelling to justify race-based faculty assignments.

The Supreme Court made clear that states and local subdivisions may constitutionally utilize racial classifications only to remedy prior discrimination: "Classifications based on race carry a danger of stigmatic harm. Unless they are *strictly* reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility." 109 S.Ct. at 721 (emphasis added).[35] Race-based faculty assignments made in furtherance of an arguably legitimate goal of providing racially integrated educational benefits to students are remedial of no prior violation.[36] Under *City of Richmond*'s restriction of racial classifications to remedial settings, therefore, this goal is necessarily defective because it lacks a remedial purpose.

Moreover, the classifications of Covington and Elliff by race are simply not probative of that goal. Plaintiffs' teaching assignments were completely unaltered. Although this Court has held that defendant's race-motivated reassignments offend the Equal Protection Clause, the reassignments of Covington and Elliff altered nothing at West Brook High other than two coaching slots at the varsity level and two coaching slots at the sophomore level. It is certainly difficult to envision how the racial diversity of a staff involved in an extracurricular activity alone—outside of the academic context in its strictest sense—might provide the kind of enhanced educational experience to the student body which rises to the level of a compelling governmental interest. Athletics are but one part of the educational experience. They are perhaps an important part, but some students choose not to participate in them at all. Indeed, the educational benefits flowing from a racially diverse varsity coaching staff, if any, were made available to only a small fraction of the total student body, the varsity team.

Additionally, defendant's argument extolling the virtues of a racially integrated varsity coaching staff is impugned by the fact that it replaced Coach Elliff—a hispanic citizen who was the only non-white member of the original varsity staff—with a black citizen. This suggests that defendant wasn't really interested in the benefits of total racial integration at all, but rather the addition of only black citizens to the varsity staff. The discrimination which black Americans have suffered is indeed a blemish on this country's heritage. Why a black coach was deemed capable of providing the benefits associated with racial di-

---

**35.** Chief Justice Rehnquist and Justices White and Kennedy joined in this portion of Justice O'Connor's lead opinion. Justice Scalia also made clear that racial classifications should be confined to remedial settings. In fact, in his more restrictive view, states should be narrowly limited to racial classifications that dismantle their own systems of illegal race discrimination:

> The benign purpose of compensating for social disadvantages, whether they have been acquired by reason of prior discrimination or otherwise, can no more be pursued by the illegitimate means of racial discrimination than can other assertedly benign purposes we have repeatedly rejected.... [O]nly a social emergency rising to the level of imminent danger to life and limb ... can justify an exception to the principle embodied in the Fourteenth Amendment that '[o]ur Constitution is color-blind....'
>
> We have in some contexts approved the use of racial classifications by the Federal Government to remedy the effects of past discrimination. I do not believe that we must or should extend those holdings to the states.

> ....
>
> In my view there is only one circumstance in which the States may act *by race* to 'undo the effects of past discrimination': where that is necessary to eliminate their own maintenance of a system of unlawful racial classification.

*Id.* at 735–37 (Scalia, J., concurring). *But see Bakke*, in which Justice Powell's lead opinion held that the goal of a diverse student body in an institution of higher learning is sufficiently compelling to allow the consideration of ethnicity among other factors in a university's admissions program. 98 S.Ct. at 2759–61.

**36.** Justice Stevens disagrees with the restriction of racial classification solely to remedial settings and has twice expressly stated his view that the educational benefits flowing from an integrated faculty easily warrant the use of racial classifications in the composition of public school faculties. *City of Richmond*, 109 S.Ct. at 731 (Stevens, J., concurring); *Wygant*, 106 S.Ct. at 1868 (Stevens, J., dissenting).

versity that a hispanic coach could not, however, is something the Court is not told.

## C. Role Models

■ Defendant also states that its actions were necessitated by "the racial composition of the varsity team...."[37] Indeed, the parties have stipulated that black players comprised approximately 80% of the 1988–89 varsity team. In *Wygant,* however, the Supreme Court forcefully denounced the "role model theory," under which racial classifications are arguably justified by the need to provide minority students with faculty members of their own race. 106 S.Ct. at 1847–48. The simple fact that the varsity team was 80% black, yet was coached by no black coaches, is therefore an insufficient justification for plaintiffs' reassignments.

## D. Summary

Defendant has therefore advanced no compelling governmental interest which warrants its race-based treatment of Covington and Elliff at issue in this case. Accordingly, this Court need not ponder whether the means used to effectuate any such interest were narrowly tailored to the achievement of that goal.[38] This Court concludes that defendant's reassignment of plaintiffs at the beginning of the 1988–89 school year because of their race is proscribed by the Equal Protection Clause.[39] Plaintiffs are entitled to judgment as a matter of law.

**37.** Brief in support of motion at 4.

**38.** "Narrowly tailored" frequently means that lawful alternative and less restrictive means could have been used. *Wygant,* 106 S.Ct. at 1850 n. 6. The degree of intrusiveness and injury to those affected by racial classifications may also bear on this issue. *See id.* at 1851–52.

**39.** Interestingly, BISD has a formal written policy assuring that faculty assignments will not turn on race: "In decision-making relating to the assignment of personnel, no consideration shall be given to the sex, national origin, race or religion of the employee." Statement of Policy # 4007, Exhibit "D" to Joint Proposed Stipulations of Fact.

## III. RELIEF

Covington has requested that this Court order his reinstatement to the position of assistant varsity football coach for the remainder of the 1988–89 school year. Injunctive relief is available to remedy § 1983 violations. *See McCormick v. Attala County Bd. of Educ.,* 541 F.2d 1094, 1095 (5th Cir.1976). Defendant, however, contends that injunctive relief is moot because plaintiffs' duties as football coaches ended at the conclusion of West Brook High's 1988 football season. This issue concerns Covington only, as Elliff has recently withdrawn his request for reinstatement.[40]

Defendant asserts that assistant coaches at West Brook have no current football coaching responsibilities other than assisting off-season training. Since West Brook High has no spring football program, defendant argues, the only difference between varsity and sophomore football in the off-season is the period in the school day in which the one-hour program is conducted. Defendant also stresses that plaintiffs' contracts for the 1988–89 school year will soon expire with no guarantees of coaching assignments for the next school year. Plaintiffs counter with the argument that their coaching salary supplement covers the entire 1988–89 school year, which has not yet ended.

■ Injunctive relief is not moot. This conclusion is not based on the differences in duties and responsibilities, if any, which continue beyond the close of the football season throughout the remainder of the school year.[41] Rather, as is obvious from

**40.** Elliff's response to defendant's supplemental memorandum.

**41.** However, it is clear that differences between the duties of varsity coaches and sophomore coaches may continue to exist throughout the school year. In the off-season, assistant varsity coaches continue to be distinguished from assistant sophomore coaches in terms of the athletes with whom they work and the time of day in which such work is accomplished, although this distinction is less significant than during the football season.

plaintiffs' contract supplements, a coaching assignment is a position and status to which teacher-coaches are hired for the entire school year. Defendant's contention that plaintiffs' positions as assistant football coaches expired at the conclusion of the 1988 football season is contradicted its own statement: "It is also undisputed that Plaintiffs' coaching contracts *as assistant football coaches* will expire *at the end of the 1988–89 school year*."[42] This statement precludes the existence of a genuine issue of material fact on the issue of mootness.

It is true that the expiration of the contract term is just days away from the issuance of this Court's ruling. Still, reinstatement is not moot as long as there is a position to which Covington can be reinstated. The Court therefore orders BISD to reinstate and recognize Covington as an assistant varsity football coach for the remainder of the 1988–89 school year.

Plaintiffs have also requested monetary damages. The Court will convene a scheduling conference with all counsel and will thereafter set this case for trial on any remaining issues.

---

**42.** Brief in support of motion for summary judgment at 19 (emphasis added); *see also* stipulation no. 6 ("Prior to August 18, 1988, both plaintiffs were assigned as assistant varsity football coaches at West Brook High School for the 1988–1989 school year.").